Peter J. BRENNAN, Secretary of Labor, United States Department of Labor

v.

GIBSON'S PRODUCTS, INC. OF PLANO, a corporation, and Gibson's Discount Centers, Inc., a corporation.

Civ. A. No. S-75-5-CA.

United States District Court, E. D. Texas, Sherman Division.

Jan. 26, 1976.

Roby Hadden, U. S. Atty., C. Houston Abel, Asst. U. S. Atty., E. D. Tex., Tyler, Tex., for petitioner.

Robert E. Rader, Jr., Bardwell D. Odum, Dallas, Tex., Charles Alan Wright, Austin, Tex., for respondents.

## OPINION OF THE COURT

Before GEE, Circuit Judge, and JUSTICE and STEGER, District Judges.

GEE, Circuit Judge:

This case requires us to determine the meaning and constitutionality of a portion of the inspection provisions of the Occupational Safety and Health Act of 1970 (OSHA).[1]

On October 23, 1974, Gibson's Products, Inc. of Plano (Gibson's), a corporation, maintained a store at 2505 Avenue K, Plano, Texas. As is customary, portions of it were open to the public and portions were not.[2] Merchandise manufactured outside the State of Texas was displayed for resale there, and the store, by reason of its purchasing and resale practices, was a business affecting commerce on and before that date.

On that date, during reasonable working hours, compliance officers of the Occupational Safety and Health Administration (Administration), U.S. Department of Labor, after duly presenting their credentials to officials of Gibson's, attempted to inspect the nonpublic portions of the store. Gibson's refused to permit this. The proposed inspection was intended to determine whether Gibson's was complying with the Occupational Safety and Health Act and, if not, to enforce compliance. The inspection was a routine or general-schedule one not occasioned by any complaint, no known emergency required immediate access by the compliance officers, and

---

1. 29 U.S.C. §§ 651 et seq.

2. The facts are stipulated and undisputed in toto.

they had no reason to believe that Gibson's was violating the Occupational Safety and Health Act on the premises.

■ Rather than seek a search warrant, it being apparent from the stipulated facts that no probable cause existed to support one, the Secretary filed this suit, citing the inspection provisions of OSHA,[3] asserting the necessity of an inspection to determine compliance, and seeking an order of the court compelling Gibson's to submit to the inspection. A show-cause order issued, and Gibson's responded, asserting fourth and fifth amendment rights, insisting that a search warrant based on probable cause was requisite to an inspection against its will, and seeking appropriate injunctive relief and the convening of this court. At hearing on the merits, Gibson's suggested that the Secretary is barred by his own pronouncements from the course of action which he here pursues, and that consequently a mere advisory opinion is here sought by him—one beyond our jurisdiction to render. We disagree, and we hold on the merits that the fourth amendment forbids such a search on such a showing as the Secretary seeks to make here. However, we do not enjoin the operation of the statute because we construe it to authorize an inspection over an objection only when conducted by warrant, and as so construed, it is unobjectionable. Our reasons follow.

## I. JURISDICTION

The pertinent regulation, 29 C.F.R. § 1903.4, provides:

Upon a refusal to permit a Compliance Safety and Health Officer, in the exercise of his official duties, to enter without delay and at reasonable times any place of employment, or any place therein, to inspect . . . [t]he . . . Officer shall . . . immediately report the refusal . . . to the Area Director. The Area Director shall immediately consult with the Assistant Regional Director *and the Regional Solicitor, who shall promptly take appropriate action, including compulsory process, if necessary.* (emphasis added)

Gibson's argument also relies on the effect of the Administration's Compliance Operations Manual, either as an independent "rule" or as an interpretation of the formal regulation. The manual directs a compliance officer who is not permitted to make an inspection to leave the premises and begin the process of obtaining an "inspection warrant." [4] However, the manual clearly indicates that the court

---

**3.** Section 8(a) of the Act provides as follows:

In order to carry out the purposes of this Act, the Secretary, upon presenting appropriate credentials to the owner, operator, or agent in charge, is authorized—

(1) to enter without delay and at reasonable times any factory, plant, establishment, construction site, or other area, workplace or environment where work is performed by an employee of an employer; and

(2) to inspect and investigate during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, any such place of employment and all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein, and to question privately any such employer, owner, operator, agent or employee.

29 U.S.C. § 657(a).

**4.** OSHA Compliance Operations Manual, pp. V–6 to V–7 (January 1972), provides:

b. In cases where a CSHO encounters a refusal to permit entry, he should advise his Area Director, who will in turn refer the matter to the appropriate Regional Administrator and the Regional Solicitor with a request that an inspection warrant be obtained.

c. If an employer refuses to permit an inspection, the CSHO should advise the employer that the Act (Section 8(a)) provides for an inspection, but he shall not state or imply that the law provides any penalty for refusing permission to inspect. If there is still a refusal to permit inspection, CSHO shall endeavor to ascertain the reason for such refusal. He will leave the premises and shall immediately report the refusal and the reason therefore to the Area Director. The AD shall immediately consult with the Regional Administrator and the Regional Solicitor who shall promptly take appropriate action including compulsory process, if necessary.

e. In cases where entry has been allowed and the employer interferes with or limits an important aspect of the investigation, the CSHO should decide whether to complete the inspection and through the Area Director

order sought here is different from the "inspection warrant" to which it refers.[5]

■ Regardless of our interpretation of the regulation and the manual, it is clear that the Secretary's actual present position is that they permit him to obtain a court order compelling inspection without a showing of probable cause. The totality of the controversy over whether the Secretary has this authority and, if so, whether he may constitutionally have it thus satisfies the definition of a justiciable "case or controversy":

> The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.[6]

The authorities which Gibson's cites, such as *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), and *United States v. Heffner,* 420 F.2d 809 (4th Cir. 1969), are inapposite. They involve the disposition *on the merits* of claims of an administrative agency's violation of its own rules.[7] They do not stand for the proposition that an agency's deviation from its own procedures deprives a court of jurisdiction to decide if the agency's actions are authorized by the applicable statute. This court properly has jurisdiction over this controversy.

## II. THE MERITS

In great part, our inquiry begins and ends with two pronouncements of the Supreme Court, each taken from opinions recently and expressly reaffirmed [8] :

> [A]dministrative entry, without consent, upon the portions of commercial premises which are not open to the public may only be compelled through prosecution or physical force within the framework of a warrant procedure.

*See v. City of Seattle,* 387 U.S. 541, 545, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943 (1967).

> Broad statutory safeguards are no substitute for individualized review.

*Camara v. Municipal Court,* 387 U.S. 523, 533, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967).

These authorities and others cited below convince us that facially the inspection provisions of OSHA amount to just such an attempt at a broad partial repeal of the fourth amendment as is beyond the powers of Congress. Only a construction of them as enforcible solely by resort to some form of administrative search warrant such as *Camara* contemplates, *id.* at 538, 87 S.Ct. 1727, can save these provisions.

A. *Some constitutional background.*

We deal, as is the rule in such cases, with a clash of near-absolutes. On the one hand we have the fourth amendment, a safeguard to ordered liberty indispensable and, historically at least, pre-

---

alert the Regional Administrator, and request the Regional Solicitor to seek an *inspection warrant.* For example, if the employer refuses to permit the walkaround or to permit the CSHO to examine records which are essential to the inspection, the inspection should be discontinued and *an inspection warrant sought.* In other cases where the employer interferes with or limits the inspection, the inspection should be completed and the matter discussed with the Area Director as to further appropriate action. (emphasis added)

5. OSHA Compliance Operations Manual, p. V–7 (January 1972), provides in relevant part:
   h. A warrant is a legal process issued by a United States Magistrate or a United States District Judge which will be *directed to the CSHO [compliance officer] authorizing the CSHO to conduct an inspection of premises*

which will be described in the warrant. (emphasis added)

6. *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937).

7. We do not decide the issue of whether the Administration's repudiation of the procedures outlined in the manual and regulation constitutes the kind of agency deviation from its own rules which would invalidate subsequent agency action.

8. "We adhere to *Camara* and *See* but we think they are not applicable here." *Air Pollution Variance Board v. Western Alfalfa Corp.,* 416 U.S. 861, 864, 94 S.Ct. 2114, 2115, 40 L.Ed.2d 607 (1974). They were not applicable there because of the "open fields" exception to the fourth amendment, which, in turn, is not applicable here.

eminent.[9] On the other stands the congressional enactment, clearly subject to the interpretation that diminishing the injuries, and consequent loss and suffering, caused by hazardous working conditions justifies investing OSHA compliance officers with something very like a perpetual general warrant. And one respected court has already concluded that insisting on special warrants for such inspections "is, constitutionally speaking, marching to the beat of an antique drum." *Brennan v. Buckeye Industries, Inc.*, 374 F.Supp. 1350, 1356 (S.D.Ga.1974).

Modern Supreme Court authority regarding constitutional warrant requirements for administrative searches commences with *Camara* and *See.*

The first of these was concerned with an attempted warrantless inspection of a residence by a city housing inspector in search of building code violations. He sought to do so under a San Francisco ordinance providing:

> Authorized employees of the City department or City agencies, so far as may be necessary for the performance of their duties, shall upon presentation of their proper credentials, have the right to enter, at reasonable times, any building, structure or premises in the City to perform any duty imposed upon them by the Municipal Code.

The state court upheld the ordinance against an attack on fourth amendment grounds, reasoning that the regulatory scheme involved was essentially civil rather than criminal and that the right of inspection authorized was limited in scope and not exercisable under unreasonable conditions.[10] The Supreme Court reversed. In so doing, it rejected—as applied to the quoted ordinance, which it will be noted is somewhat broader that the OSHA provision—many of the arguments addressed to us here: no search for evidence of criminal action, administrative expediency ("the warrant process could not function effectively in this field"), and the demand of the public interest for warrantless administrative searches. In so doing, it stated in words which we find enlightening here:

> [O]ne governing principle, justified by history and by current experience, has consistently been followed: *except in certain carefully defined classes of cases,* a search of private property without proper consent is "unreasonable" unless it has been authorized by valid search warrant. (emphasis added)

387 U.S. at 528–29, 87 S.Ct. at 1731.

In a companion case decided the same day, Norman See sought reversal of his conviction for refusing to admit the Seattle Fire Department's representative to inspect his locked commercial warehouse, without either warrant or probable cause to believe a violation existed. The intended inspection, part of a routine, citywide canvass, was purportedly authorized by a city ordinance stating:

> It shall by the duty of the Fire Chief to inspect and he may enter all buildings and premises, except the interiors of dwellings, as often as may be necessary for the purpose of as-

---

**9.** The rights which it secures have inspired not only great phrases but great events.

It was during the House of Commons debate on whether to outlaw general warrants that William Pitt made his now classic statement that

> The poorest man may, in his cottage, bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter. . . .

Hale, Vol. II, p. 150.

In America the validity of searches and search warrants first arose in a dispute over the Writs of Assistance, which empowered officers of the Crown to search at will, and authorized the apprehension of undescribed persons and the indiscriminate seizure of property. On July 3, 1776, John Adams wrote his wife from the Second Continental Congress that the resolution of independence had been passed and recollected "the argument concerning writs of assistance, which I have hitherto considered as the commencement of the controversy between Great Britain and America." Works of John Adams, Vol. X, p. 276.

**10.** *Camara v. Municipal Court,* 237 Cal.App.2d 128, 46 Cal.Rptr. 585 (1st Dist.Ct.App.1965).

certaining and causing to be corrected any conditions liable to cause fire, or any violations of this Title, and of any other ordinance concerning fire hazards.

Again, the Supreme Court reversed. Its opinion extends the *Camara* reasoning to commercial property, indicating that no distinction can be drawn between warrantless inspections of commercial property and those dwellings. Brushed aside again are the ready-to-hand arguments of convenience and exigency, both rejected in terms by *Camara.*

So, not so very long ago, were rejected municipal attempts to enact, as valid exceptions to fourth amendment guarantees, somewhat general dispensations from warrant strictures. Since then, however, a significant number of decisions, both by the Supreme Court and by inferior tribunals, have approved narrower dispensations in certain defined classes of cases.

First came *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). This, though from above, was narrow. It approved warrantless inspections of federally licensed dealers in spirits on the ground of our history, known and long, of government licensing and regulation of dealings in liquor. There shortly followed *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), which extended the *Colonnade* reasoning to firearms dealers, as pervasively regulated and as acceptors of federal licenses. As such, they were deemed to have in some sense impliedly consented to unwarranted inspections.

Next, citing and relying on *Biswell, Colonnade,* and each other, a succession of lower court opinions upheld warrantless administrative searches in various narrowly defined contexts and for limited purposes: where integrity of product was of special concern, *United States v. Del Campo Baking Mfg. Co.,* 345 F.Supp. 1371 (D.Del.1972) (Food, Drug and Cosmetic Act inspection of bakery); where conditions of employment were uniformly and somewhat unavoidably hazardous, *Youghiogheny & Ohio Coal Co. v. Morton,* 364 F.Supp. 45 (S.D.Ohio 1973) (inspection of "three deep, underground coal mines" by Bureau of Mines inspectors under Coal Mine Health and Safety Act of 1969) [11]; or where a special need to control potentially dangerous items existed, *United States ex rel. Terraciano v. Montanye,* 493 F.2d 682 (2d Cir.), *cert. denied,* 419 U.S. 475, 95 S.Ct. 137, 42 L.Ed.2d 114 (1974) (New York Health Department inspection of pharmacist's records relating to narcotics and other drugs).

In the meantime, however, and in a different context, there came a powerful indication that *See* and *Camara* continue to express the Supreme Court's views on general fourth amendment dispensations. In *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), the Court invalidated a warrantless search by a roving patrol of the Immigration and Naturalization Service purportedly authorized by statute and regulations permitting warrantless searches for aliens, without probable cause, within a 100-mile zone along international borders. Citing *Camara* and *See,* and rejecting arguments based on *Colonnade* and *Biswell,* the Court laid course for us:

In *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930, the Court held that administrative inspections to enforce community health

---

11. Judge Rubin's excellent opinion notes Congress' specific determination in the Act that "conditions that prevail in many mines endanger or potentially endanger . . . the miners," 364 F.Supp. at 52, and goes on to remark:

Our view might be entirely otherwise were we not dealing with a business context of a nearly inherently dangerous type. If Congress, for example, after taking note of the wide incidence of crime, authorized warrantless entry into private homes, we would be unable to reconcile such a statute with the command of the Fourth Amendment.

*Id.* n. 7.

and welfare regulations could be made on less than probable cause to believe that particular dwellings were the sites of particular violations. Id., at 534–536, 538, [87 S.Ct. 1727 at 1733–1734, 1735] 18 L.Ed.2d 930. Yet the Court insisted that the inspector obtain either consent or a warrant supported by particular physical and demographic characteristics of the areas to be searched. Ibid. See also *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943. The search in the present case was conducted in the unfettered discretion of the members of the Border Patrol, who did not have a warrant, probable cause, or consent. The search thus embodied precisely the evil the Court saw in *Camara* when it insisted that the "discretion of the official in the field" be circumscribed by obtaining a warrant prior to the inspection. *Camara,* supra, [387 U.S.] at 532–533, [87 S.Ct. 1727 at 1733] 18 L.Ed.2d 930.

Two other administrative inspection cases relied upon by the Government are equally inapposite. *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60, and *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87, both approved warrantless inspections of commercial enterprises engaged in business closely regulated and licensed by the Government. In *Colonnade,* the Court stressed the long history of federal regulation and taxation of the manufacture and sale of liquor, 397 U.S. at 76–77, [90 S.Ct. 774, 776–777] 25 L.Ed.2d 60. In *Biswell,* the Court noted the pervasive system of regulation and reporting imposed on licensed gun dealers, 406 U.S., at 312 n. 1, 315–316, [92 S.Ct. 1593, at 1594, 1596] 32 L.Ed.2d 87.

A central difference between those cases and this one is that businessmen engaged in such federally licensed and regulated enterprises accept the bur-dens as well as the benefits of their trade, whereas the petitioner here was not engaged in any regulated or licensed business. The businessman in a regulated industry in effect consents to the restrictions placed upon him. As the Court stated in *Biswell*:

It is also plain that inspections for compliance with the Gun Control Act pose only limited threats to the dealer's justifiable expectations of privacy. When a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection. Each licensee is annually furnished with a revised compilation of ordinances that describe his obligations and define the inspector's authority . . . . The dealer is not left to wonder about the purposes of the inspector or the limits of his task. *United States v. Biswell.* Id., at 316, [92 S.Ct. 1593, at 1596] 32 L.Ed.2d 87.

Moreover, in *Colonnade* and *Biswell,* the searching officers knew with certainty that the premises searched were in fact utilized for the sale of liquor or guns. In the present case, by contrast, there was no such assurance that the individual searched was within the proper scope of official scrutiny—that is, there was no reason whatever to believe that he or his automobile had even crossed the border, much less that he was guilty of the commission of an offense.

413 U.S. at 270–72, 93 S.Ct. at 2538–2539.[12]

Shortly after *Almeida-Sanchez,* and on the day before *Air Pollution Variance Board v. Western Alfalfa Corp.* 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974), noted hereafter, was argued, the OSHA warrantless inspection provisions were squarely upheld by Judge Lawrence in

12. *Almeida-Sanchez* arrived in time to be considered, and carefully distinguished, by Judge Rubin in *Youghiogheny.* 364 F.Supp. at 49.

*Brennan v. Buckeye Industries, Inc.*[13] The heart of the court's careful opinion is its vision of a general narrowing of the *Camara* and *See* holdings by *Colonnade*[14] and by *Biswell*, a sort of broad retreat from insistence on strict fourth amendment standards in administrative matters when the demands of administrative efficiency and governmental interest are great. *Almeida-Sanchez* is not mentioned, and the opinion plainly represents a conscientious attempt to locate the current status of the fourth amendment safeguards, read by the court as being in a state of mild and general ebb under the influence of congressional and administrative pressure.

Only a month after *Buckeye Industries,* however, came *Western Alfalfa,* in which a unanimous Court, per Justice Douglas, reaffirmed *See* and *Camara* in express terms and in the context of administrative inspections conducted for purposes of promoting health and sanitation. With it, our brief survey of relevant authority is complete.

■ From it and from *Almeida-Sanchez* we deduce that broad and indiscriminate inroads on fourth amendment safeguards, wrought in the name of administrative expedience and weighty governmental interest, are to be viewed with no greater favor now than at the time of *See* and *Camara*. However, where the inroad is narrow, supported by specific and clear congressional findings, and the object or practice to be regulated is inherently dangerous and (perhaps or) traditionally regulated as in *Colonnade* and *Biswell*, it is more likely to be tolerated. And, since *Western Alfalfa,* it

seems plain that the fourth amendment is not to be viewed as in a condition of general retreat before an administrative advance. So instructed, we turn to the matter in hand.

**B. *Warrantless inspections under OSHA.***

■ OSHA's sweep is broad, and Congress' findings supporting it are slender. Made subject to its warrantless inspection is every private concern engaged in a business affecting commerce which has employees and all "environments" where these employees work. It thus embraces indiscriminately steel mills, automobile plants, fishing boats, farms and private schools, commercial art studios, accounting offices, and barber shops—indeed, the whole spectrum of unrelated and disparate activities which compose private enterprise in the United States.[15] As a basis for imposing this regime, Congress found that:

> [P]ersonal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments[,]

or, in other words, work injuries and illnesses burden commerce substantially in various evident ways. To be contrasted with this finding—which is, of course, entitled to the greatest deference in our considerations despite its general and somewhat obvious character—are such detailed and specific ones as preface the Mine Safety Act[16] upheld in *Youghiogheny*. Nor do *Biswell* or *Colonnade* offer much support to the text of these OSHA provisions. As viewed in

---

13. 374 F.Supp. 1350 (S.D.Ga.1974).

14. As had Judge Friendly in *Terraciano,* cited and quoted in *Buckeye Industries,* 374 F.Supp. at 1355.

15. We would say the private sector, if there were a public sector that produced anything.

16. The Act contains the following relevant congressional findings and declarations:

> (a) the first priority and concern of all in the coal mining industry must be the health and safety of its most precious resource—the miner;

> (b) deaths and serious injuries from unsafe and unhealthful conditions and practices in the coal mines cause grief and suffering to the miners and to their families;

> (c) there is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal mines in order to prevent death and serious physical harm, and in order to prevent occupational diseases originating in such mines;

> (d) the existence of unsafe and unhealthful conditions and practices in the Nation's coal

the passage from *Almeida-Sanchez* quoted above, the crucial features of the liquor and gun businesses searched were licensing and a pervasive history of governmental regulation. Additional support for the warrantless searches there approved was found in the searchers' certain knowledge that the concerns searched had on the premises and dealt in the sensitive commodities—guns and liquors—which occasioned official scrutiny. By contrast, the discount house which is the target here is not licensed, it has no history of close regulation, and the OSHA provisions appearing facially to authorize the search are in no sense limited in their application to such businesses. Nor is there any reason whatever, let alone a certainty, to believe that the thing sought to be controlled—hazardous working conditions—exists in the area to be searched. A finding by Congress that such conditions exist in most enterprises subject to OSHA might throw a different light on the subject, but there was none, and we doubt there could have been.

Instead, we contemplate a roving commission in the vein of those considered in *Camara, See* and *Almeida-Sanchez,* exercised by these compliance officers in their unfettered discretion. No emergency existed, and no functional or general equivalent of probable cause such as *Camara* [17] envisions is shown. This warrantless search would not comply with fourth amendment standards and cannot be countenanced. What, then, of the OSHA inspection provisions? Is it our duty to strike them down?

### C. The proper meaning of OSHA.

■■ Fortunately, we are spared the necessity of invalidating the OSHA inspection provisions. The statute does not explicitly authorize warrantless searches. While it does authorize entries "without delay," this is not an unambiguous equivalent for "without a warrant." The legislative history of OSHA is generally silent on this point.[18] Mindful of our duty to construe a statute, if possible, in a manner consistent with the fourth amendment,[19] we believe that 29 U.S.C. § 657(a) was intended by Congress to authorize objected-to OSHA inspections only when made by a search warrant issued by a United States Magistrate or other judicial officer of the third branch under probable cause standards appropriate to administrative searches—that is, in a constitutional manner. Our independent interpretation of the statute is reinforced by the contemporaneous administrative construction of the statute, as evidenced by the requirement of an "inspection warrant" found in the Compliance Operations Manual and by the reference to "compulsory process" in 29 C.F.R. § 1903.4. Although the Administration has obviously changed its mind as to the necessity of a

---

mines is a serious impediment to the future growth of the coal mining industry and cannot be tolerated;
(e) the operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of such conditions and practices in such mines;
(f) the disruption of production and the loss of income to operators and miners as a result of coal mine accidents or occupationally caused diseases unduly impedes and burdens commerce; and
(g) it is the purpose of this chapter . . . (2) to require that each operator of a coal mine and every miner in such mine comply with [mandatory health and safety] standards . . . . *See* 30 U.S.C. § 801 (1970).

17. Or Mr. Justice Powell's concurring opinion in *Almeida-Sanchez.*

18. The only suggestion that the statute contemplates warrantless searches is a passing remark to that effect in the minority views on a version of the bill which was rejected. *See* H.R.Rep. No. 1291, 91st Cong., 2d Sess. 55 (1970). The only discussion of the "without delay" phrase shows that it was intended to prevent an employer from thwarting inspections by avoiding the inspector's presentation of credentials. 116 Cong.Rec. 38,709 (1970) (remarks of Congressman Galifianakas, quoting Congressman Steiger). The author of the "without delay" phrase reminded the House that inspections would have to be conducted in accordance with "applicable constitutional protections." *Id.* (remarks of Congressman Steiger).

19. *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

warrant, its initial and more contemporaneous interpretation is entitled to greater weight.[20]

 While we recognize that our approach is subject to criticism as remedial to the verge of redrafting, if there is a place for unusual deference anywhere in the relations between the branches of our federal government it surely exists where a court of first instance is required to pass upon the constitutionality of a broad national enactment of the Congress. We think it reasonable to assume that Congress intended nothing beyond its constitutional powers and that the requirement of a search warrant for resisted inspections was not made explicit in part because the need for a warrant was clear in those days before *Biswell* and its progeny appeared. And after all, Congress need not re-enact the bill of rights as a preamble to every statute to be sure that the statute will be construed against its background and with a recognition that Congress' fidelity to fundamental rights is as firm as ours.

The petition is denied, and the counterclaim is dismissed.

---

**20.** *See, e. g., Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *cf. Investment Company Institute v. Camp,* 401 U.S. 617, 627–28, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (appellate counsel's post hoc rationalizations do not substitute for an exercise of agency discretion).