**UNITED STATES of America,
Plaintiff-Appellant,**

**v.**

**CONSOLIDATION COAL COMPANY, a corporation, Robert Lasick, Richard Schrickel, Francis Leo Marks, Raymond Zitko, individuals, Defendants-Appellees.**

**Nos. 76–2518 to 76–2522.**

United States Court of Appeals, Sixth Circuit.

Argued April 15, 1977.

Decided July 21, 1977.

Rehearing and Rehearing En Banc Denied Aug. 29, 1977.

Rehearing and Rehearing En Banc Denied Sept. 16, 1977 in No. 76–2518.

Courtney, III, Special Asst. U. S. Attys., Philip Wilens, Dept. of Justice, Crim. Div., Washington, D. C., for plaintiff-appellant in all cases.

William J. Melvin, Fontana, Ward, Kaps & Perry, Columbus, Ohio, Anthony J. Polito, Roger Curran, Rose, Schmidt & Dixon, Pittsburgh, Pa., for defendants-appellees in 76–2518.

Jerry Weiner, J. Michael McGinley, Weiner, Lippe & Cromley, Columbus, Ohio, for defendants-appellees in 76–2519.

Stephen M. Stern, Stern, Stern & Stern, Steubenville, Ohio, for defendants-appellees in 76–2520.

Richard C. Addison, Columbus, Ohio, for defendants-appellees in 76–2521 and in 76–2522.

Addison & Smith, Columbus, Ohio, Charles H. Bean, St. Clairsville, Ohio, for defendants-appellees in 76–2521.

William J. Abraham, Abraham & Purkey, Columbus, Ohio, for defendants-appellees in 76–2522.

William W. Milligan, U. S. Atty., Columbus, Ohio, Richard I. Chaifetz, Robert E.

Before CELEBREZZE and ENGEL, Circuit Judges, and CECIL, Senior Circuit Judge.

CELEBREZZE, Circuit Judge.

These appeals arise in the context of a federal prosecution brought against Consolidation Coal Company and eight of its employees for criminal violations of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 801 *et seq.* The Government invokes 18 U.S.C. § 3731 to challenge two interlocutory orders of the district court granting evidentiary suppression and return to defendant Appellees of all materials seized in May, 1974, during simultaneous searches of five Company coal mine offices and its general office in Ohio. These searches were authorized by six warrants issued by a federal magistrate.[1] In finding the requisite probable cause, the magistrate relied upon two affidavits sworn to by

---

1. Nine warrants were, in fact, issued and nine searches performed. No evidentiary materials were seized at one location and the Government voluntarily returned to the Company the fruits of two other searches.

agents of the United States Department of the Interior. The affidavits recited an account by an unnamed, ex-employee of systematic efforts by the Company to evade the respirable dust concentration standards and monitoring requirements imposed by Section 842 of the Act.[2]

The confidential informant claimed that the Company caused all ambient atmospheric dust samples taken pursuant to Section 842(a) to be weighed in its own laboratory prior to submitting them to the Secretary of the Interior for analysis. If a legitimate sample were found to offend the mandatory federal standard, an artificially "clean" [low] sample, prepared by Company technicians under controlled conditions, would be substituted and the authenticating documentation altered to conform.[3] Such false reporting, if knowingly participated in by all Appellees, would violate three criminal provisions of the Act, 30 U.S.C. § 819(b), (c) and (d).[4]

In September, 1975, the Appellees and others were named in a 178 count federal indictment charging them with numerous violations of 30 U.S.C. § 819 as well as two counts of conspiracy. In October, the Company moved to suppress the evidentiary fruits of the searches of its six offices.[5] The district court responded to the criminal nature of the proceeding, the key role played by the confidential informant, and the criminal focus of the original investigation [6] by treating this motion as an invitation to assess the constitutional sufficiency of the Government's warrant affidavits under the stringent, two-pronged test of the reliability of a criminal "tip" articulated in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The court concluded that the two affidavits, even when read in concert, imparted information which was conclusory, potentially stale, and otherwise insufficient to establish probable cause to believe that Appellees had committed or were in the process of committing criminal acts. Therefore, in June, 1976, the district court granted the Company's motion to suppress.

Subsequently, seven of the individual defendants, including the individual Appellees

---

2. Section 842 represents Congress' effort to remove one of the most serious hazards of coal mining. Prolonged inhalation of excessive concentrations of respirable coal dust is known to cause pneumoconiosis, a chronic lung disease commonly known as "black lung." In its advanced form pneumoconiosis leads to severe disability and premature death.

3. Sampling pursuant to Section 842 demands that certain miners wear a small, plastic air filtering device called a "cassette" and an air pump while working a normal production shift in the mines. The pump sucks air into the cassette, and filter paper inside captures the respirable dust particles. The resulting sample approximates the concentration of dust present in the mine atmosphere to which the miner bearing the cassette is exposed. When the miner completes his shift he turns the equipment over to a mine official and signs or initials a "mine data card" which identifies the miner, the date, the section of the mine in which the sample was taken, and the miner's occupation code. The mine official also signs the card. Each cassette is uniquely associated with its respective mine data card by a number which has been stamped on both by the manufacturer. To alter legitimate samples it is necessary to either physically open a cassette and remove a portion of the dust or to "void" the cassette and substitute a bogus one. The latter procedure would entail forging the miner's signature on the mine data card. The informant implicated the Company in both forms of deception.

4. Section 819(b) subjects an operator who "willfully violates a mandatory health or safety standard * * *" to a maximum penalty of $25,000. fine or one year in jail or both. Section 819(c) extends this liability to any director, officer or agent of such corporation "who knowingly authorized, ordered, or carried out such violation." Section 819(d) imposes a maximum penalty of $10,000. fine and/or six months in jail for making "any false statement, representation, or certification in any application, record, report, plan or other document" filed or maintained pursuant to the Act.

5. A substantial volume of records and documents were seized [including a number of metal file cabinets and file card drawers containing allegedly relevant data] as well as a number of sampling cassettes.

6. This criminal orientation was dramatized by the fact that the mine safety inspectors who executed the warrants were deputized as Special Deputy United States Marshals.

herein, filed motions to suppress the evidence seized from their respective Company offices. Only Appellees Marks and Zitko asserted fourth amendment standing as persons aggrieved by all six intrusions and moved for suppression of all of the seized evidence despite the fact that only a portion of the materials were uncovered in their private offices.[7] In October, 1976, the district court granted the suppression motions of all the individual Appellees. At this point the court had already denied a Government motion for reconsideration of its adverse June ruling. The Government seasonably perfected the instant appeals which were consolidated on motion for oral argument and disposition.

The Government advances three alternative rationales for reversing the district court's orders: 1) the searches were constitutionally permissible without warrants under Section 813(a)(4) which authorizes "frequent inspections and investigations in coal mines * * * for the purpose of * * determining whether or not there is compliance with the mandatory health or safety standards or with any notice, order, or decision issued under [the Act]," see *Youghiogheny and Ohio Coal Company v. Morton*, 364 F.Supp. 45 (S.D.Ohio 1973); 2) the district court improperly undertook a *de novo* review of the quantum of probable cause supplied by the Government's affidavits without due deference to the judgment of the magistrate, *United States v. Giacalone*, 541 F.2d 508, 513 (6th Cir. 1976); 3) even if the affidavits are found to be constitutionally infirm, the exclusionary rule should not apply here because the Government inspectors acted in good faith on the authority of facially valid warrants.

We reject out of hand the Government's first contention. The *Youghiogheny* decision stands for the proposition that only inspections of the *underground* portions or "active workings" of coal mines may be performed without search warrants under Section 813(a) and (b). It expressly excludes from the purview of its holding warrantless searches of offices on the mining property in which "[t]he mine operator * * * does have a general expectation of privacy." 364 F.Supp. at 51 n. 5. In addition, nothing in the Act authorizes the wholesale seizure of records which took place here. Even where a statute requires records to be maintained and authorizes on-premises inspection of them in the normal course, no precedent sanctions direct access to the records without demand in the absence of a search warrant:

> It is, however, implicit * * * that the right to inspect does not carry with it the right, without warrant in the absence of arrest, to reach that which is to be inspected by a resort to self-help in the face of the owner's protest.

*Hughes v. Johnson*, 305 F.2d 67, 69 (9th Cir. 1962).

The Government wisely recognized its constitutional obligation to obtain prior judicial approval before entering the six mine offices to locate and seize allegedly incriminating records subsumed within Company files.

We agree with the Government's second contention that the scope of the district court's review of the two supporting affidavits was overly broad. However, rather than attribute this to the court's failure to honor the magistrate's original finding of probable cause, we see it as reflecting reliance upon an excessively demanding standard of review which ignored the administrative concerns which prompted the original warrant requests. This finding leads us to reverse the two suppression orders and to remand for further proceedings. We therefore need not reach the Government's third contention regarding the scope of the exclusionary rule.

The Government asserts that its affidavits will withstand an *Aguilar-Spinelli* analysis if read in a common sense rather than hypertechnical fashion. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Hodge*, 539 F.2d 898, 903 (6th Cir. 1976). Although

---

7. The issue as to the standing of Marks and Zitko to challenge the searches is mooted by our disposition of their appeals on other grounds.

we tend to agree, we are persuaded that there are more compelling grounds for reversal than a mere misreading of the affidavits. In the absence of guidance from the case law, the district court treated the contested search warrants as implements of a conventional criminal investigation. In its memorandum opinion and order of September 2, 1976, denying the Government's motion for reconsideration, the court rejected the suggestion that the searches involved intrusions which fall within the scope of "inspections and investigations" authorized by Section 813(a). We believe that this conclusion was erroneous as a matter of law. It justified the overly strict scrutiny of the search warrant affidavits which persuaded the court to grant Appellees' motions to suppress.

From our reading of the record and the enforcement provisions of the Act, we conclude that the searches in issue were essential components of a single compliance inquiry authorized by Section 813(a). They involved reasonable intrusions which were "routine"[8] in scope if not in motivation. Their regulatory character was not diminished by the fact that they were predicated upon overt criminal suspicion rather than administrative necessity. We hold that the district court erred in refusing to sustain these searches upon a lesser showing of probable cause comparable to that required to obtain a warrant to perform a periodic, administrative inspection of a commercial establishment. *See v. City of Seattle*, 387 U.S. 541, 545, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).

We begin with the premise that the nature of the Act entitles it to expansive interpretation:

> Since the Act in question is a remedial and safety statute, with its primary concern being the preservation of human life, it is the type of enactment as to which a 'narrow or limited construction is to be eschewed.' (citation omitted) *Freeman Coal Mining Co. v. Interior*

*Board of Mine Operations Appeals*, 504 F.2d 741, 744 (7th Cir. 1974); *accord, Zeigler Coal Co. v. Kleppe*, 175 U.S.App. D.C. 371, 536 F.2d 398, 405 (1976).

Viewed in this light, Section 813 bespeaks a congressional intent to permit federal inspectors to enter coal mine offices *in the normal course* and to *independently* assess and review (if not seize) pertinent indicia of compliance with the Act. Section 813(a) specifically empowers authorized representatives of the Secretary to carry out both "inspections and investigations in coal mines." Congress' inclusion of the term "investigation" reflects an intent to condone more intrusive, systematic invasion of commercial privacy than that associated with a mere inspection. It implicitly sanctions purposeful efforts to corroborate or disprove specific allegations of infraction.

Significantly, Section 813(a) does not restrict the purpose of investigations to ascertaining the causes of mine accidents. They may aid in "determining whether or not there is compliance with the mandatory health or safety standards" promulgated under the Act. 30 U.S.C. § 813(a). In marked contrast to the comparable provision of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 657(a)(2), Section 813(a) does not catalogue the permissible objects of inspection. We interpret this omission as evidence of congressional intent to endow mine safety inspectors with the broadest possible discretion.

It follows that business records and other paraphernalia, which are maintained pursuant to the Act, are appropriate targets for periodic federal scrutiny. *Youghiogheny and Ohio Coal Company v. Morton, supra* at 51 n. 5. In the instant case, these materials constitute the veritable life blood of a statutory scheme which contemplates responsible, self-monitoring of working conditions by mine operators. The efficacy of the respirable dust control program, 30 U.S.C. § 842, is entirely dependent upon the integrity with which operators sample, record

---

8. Routine in the sense that they were permissible under the Act rather than that they were historically a common enforcement practice.

and report these conditions. We see no other realistic way to ensure compliance short of direct, on-site access to these records as they are *internally* maintained.

■ Even in the absence of warrants, the investigators had the right to enter the six company facilities which were searched. Section 813(b)(1) provides a "right of entry to, upon, or through any coal mine" for the purpose of making any inspection or investigation mandated by the Act. The term "coal mine" is broadly defined in Section 802(h) to include *"all* structures * * * placed upon * * * or above the surface [of land] used in, or to be used in, or resulting from the work of extracting * * * coal." [9] All six offices, including the Company's general office, were situated in close proximity to working mines and were instrumental in he administration of ongoing mine operations. They were, therefore, part of coal mine premises within the meaning of the Act and subject to entry by representatives of the Secretary at reasonable times.

Although the Act does not expressly empower investigators to use self-help to locate objects of their inquiry which may be intermingled in mine operators' files, neither does it establish formal demand as a condition precedent to assessing them. [10] Voluntary delivery upon request may be the procedure of choice; it may, in fact, be constitutionally imperative in the absence of a search warrant. *See Youghiogheny and Ohio Coal Company v. Morton, supra* at 51 n. 5. However, Section 813(a) confirms that Congress wished to foreclose any opportunity, potentially available to mine operators, to bias the inspection process:

> In carrying out the requirements of clauses * * * (4) [inspections and investigations for purposes of compliance review] * * *, no advance notice of inspection shall be provided to any person.

Only by fully exploiting the element of surprise can potentially unscrupulous mine operators be deterred from engaging in systematic evasion of the Act:

> Here, if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential.

*United States v. Biswell,* 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972).

This secrecy requirement would be reduced to a hollow formalism if we were to read into the Act the obligation to make an access demand incident to every "surprise" inspection or investigation. Once an investigator has requested that sensitive data be voluntarily disclosed, the mine operator is immediately forewarned in spite of the confidentiality of the inspection schedule. This affords him an inherent opportunity to withhold unfavorable information or to supply bogus documents. In contrast, a surprise inspection of the physical conditions in the working mine provides a more reliable measure of compliance because overt violations of health and safety standards cannot be readily concealed in a matter of minutes. It therefore represents a more effective deterrent to sharp practices.

■ We conclude that Section 813(a) and (b) must be read to authorize federal investigators, as part of periodic investigations in coal mines, to enter mine offices in which they reasonably believe that evidentiary indicia of compliance are maintained and to retrieve these materials by searching areas in which it is likely that they will be found. Intrusions of this scope may only be undertaken pursuant to valid search warrants. The remaining question is what measure of probable cause should be applied by a judicial officer in deciding whether to issue such warrants.

---

9. Where Congress wished to limit the environmental scope of inspection, it did so in express terms. Thus the "spot inspections" authorized by Section 842(g) may only be performed in the "active workings" of mines, a term which we interpret to exclude mine offices.

10. The Secretary's subpoena power under 30 U.S.C. § 813(d) is limited to compelling the production of records and witnesses at public hearings.

At the outset we stated our belief that the six searches fell within the ambit of routine investigations sanctioned by Section 813. Nothing within the record militates to the contrary. The premises searched were permissible investigative targets because there was ample reason to surmise that they would be repositories of evidence of compliance (or non-compliance) with the requirements of Section 842. The searches were accomplished during normal working hours so that forced entry or destruction of property was avoided. The scope of the intrusions *within* the offices was apparently limited to locales where pertinent records and dust sampling cassettes might be stored. No factor cited by the Appellees convinces us that the searches were an administrative ruse to justify unbridled, exploratory forays for evidence of *any* criminal infraction. The warrants themselves strictly limited the items which could be seized to those related to activities which would not have been engaged in by the Company but for the demands of Section 842.

In recognition that the proposed searches were sanctioned by the Act, the warrant applications should have been tested for constitutional sufficiency against an administrative standard of probable cause. *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Brennan v. Gibson's Products, Inc. of Plano*, 407 F.Supp. 154 (E.D.Tex. 1976). This is a "flexible standard of reasonableness that takes into account the public need for effective enforcement of the particular regulation involved." *See v. City of Seattle*, 387 U.S. at 545, 87 S.Ct. at 1740. Here the public need, recognized as "urgent" by Congress in the preamble to the Act, is the promotion of the "health and safety of [the coal mine industry's] most precious resource—the miner," 30 U.S.C. § 801(a). The demands of effective enforcement, which may prevent needless injury, disability or death, outweigh the "historic interests of 'self protection'" which would otherwise come into play when the inspector asks "that the property owner open his doors to

a search for 'evidence of criminal action' which may be used to secure the owner's criminal conviction." *Camara v. Municipal Court of the City and County of San Francisco, supra*, 387 U.S. at 530, 87 S.Ct. at 1731.

The basic rationale for demanding a more compelling showing of probable cause where the purpose of the intrusion is to uncover the fruits or instrumentalities of crime is inapposite in this context. *See Camara v. Municipal Court of the City and County of San Francisco, supra* at 535, 87 S.Ct. 1727. The scope of the searches became no broader because they were predicated on criminal suspicions than they would have been if justified by administrative exigencies. The magistrate would have been correct in issuing the warrants even if the investigators had only alleged a pattern of disparity between ambient dust levels reported by the Company and those visually observed during routine inspections. To deny warrant applications solely because criminal probable cause is lacking would frustrate compliance review and defeat attainment of the policy objectives of the Act. Where a search is routinely permissible on an administrative basis, it would indeed be anomalous if we were to raise the threshold probable cause requirement when the Government presents concrete evidence of irregular conduct by the mine operator. "If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant." *Id.* at 539, 87 S.Ct. at 1736.

■ Our conclusion is bolstered by the fact that the coal mining industry has a history of close federal regulation under the aegis of the Commerce Clause. *See Youghiogheny and Ohio Coal Company v. Morton*, 364 F.Supp. at 49 & n. 3. Therefore, it is reasonable to assume that mine operators have a reduced expectation of privacy in their business offices than less highly scrutinized enterprises. *See generally Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). They have virtually no expectation of privacy in records and paraphernalia which they exclusively maintain

in compliance with the Act. *Youghiogheny and Ohio Coal Company v. Morton*, 364 F.Supp. at 51 n. 5. Therefore, the quantum of probable cause required to sustain the searches here need not be as great as it might have to be if the same intrusions were contemplated in a less regulated industry.

The Supreme Court has permitted substantial intrusions within federally licensed commercial premises *without* a warrant where "regulatory inspections further urgent federal interests, and the possibilities of abuse and the threat to privacy are not of impressive dimensions," *United States v. Biswell*, 406 U.S. 311, 317, 92 S.Ct. 1593, 1597, 32 L.Ed.2d 87 (1972). These routine, unannounced inspections have been authorized by federal statutes similar in scope and purpose to the Act in that they invoke the police power to protect the public welfare. *Colonade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970).[11] Although investigative searches of mine operator records may exceed the scope of judicially condoned warrantless inspections, we do not believe that the difference is sufficiently great to warrant a quantum leap to a criminal probable cause standard. An administrative showing should suffice to protect the legitimate privacy expectations of mine operators.

We question the practicality of imposing a double standard of review where search warrant applications are in furtherance of Section 813 investigations. If the Government's burden of persuasion significantly increases when it candidly discloses its criminal leads, it will have an incentive to withhold this information by couching all of its warrant requests in terms of administrative necessity. In those cases in which criminal suspicions are invoked by the proffered ad-

ministrative rationale, the magistrate may find it extremely difficult to select the appropriate standard of review. Any investigation initiated to secure compliance with the Act has potential criminal overtones. Section 819 makes willful noncompliance or fraud criminally actionable. Prosecution of all infractions is not a foregone conclusion, however, because the Secretary has inherently broad discretion to bypass criminal sanctions in favor of civil penalties. In the context of regulatory enforcement, we are loath to attribute conclusive legal significance to the apparent focus of an investigation. The magistrate's task will be expedited and the opportunity for reversible error substantially reduced if all Section 813 search warrant applications are subject to a uniform, administrative standard of review, whether or not criminal violations of the Act are suspected.

■ We need not dwell on the subtleties of the Government's two supporting affidavits to satisfy ourselves that they provided sufficient administrative probable cause to issue the six search warrants. Read together under the authority of *United States v. Serao*, 367 F.2d 347, 349 (2d Cir. 1966), the affidavits vividly describe an ex-employee's personal involvement in a system implemented by the Company to defeat the regulatory intent of Section 842 of the Act.[12] The informant's statements to federal authorities recount other information supplied to him by two identified co-workers who also admit their participation in the scheme. Through the informant, these technicians allege that the illegal practices, in which they play a key role, are common to a number of Company mines, including the locations actually searched. In addition, one of the affiants, a federal mine safety inspector, describes recent observations,

---

11. The constitutionality of inspections of commercial premises without a warrant under Section 657 of Occupational Health and Safety Act of 1970, 19 U.S.C. § 651 *et seq.* is currently before the Supreme Court in the case of *Marshall v. Barlow's, Inc., prob. juris. noted* 430 U.S. 964, 97 S.Ct. 1642, 52 L.Ed.2d 354 (1977).

12. The two affidavits were formally submitted in support of only one warrant application.

The other five applications exclusively relied upon one of the two affidavits, although all of the applications were *contemporaneously* presented to the magistrate for review. Under *Serao*, we believe we are justified in concluding that the magistrate was privy to the information contained in both affidavits before ruling on any of the related applications.

made by him in one of the Company's mine offices, which tend to confirm the continuing nature of the violations.[13]

To a reasonably prudent person this information suffices to implicate the Company and a number of its employees in a course of conduct intended to compromise the working conditions of its miners. Indications of such flagrant non-compliance demand a prompt administrative response, even in the absence of criminal violations. Where the physical well-being of hundreds of miners may be jeopardized if warrants are denied, we remain unconvinced that a confidential informant's tip must be subjected to an *Aguilar-Spinelli* analysis of reliability. The legal basis for this seems particularly suspect in this case where the informer is an ex-employee of the mine operator. The Act expressly authorizes a "representative of the miners" who "has reasonable grounds to believe that a violation of a mandatory health or safety standard exists" to obtain an immediate inspection by giving appropriate written notice. 30 U.S.C. § 813(g). The informant here served as the putative miner's representative who provided these "reasonable grounds." Therefore, the magistrate properly granted the warrant requests.

We conclude that the district court erred in failing to perceive the administrative character of the search warrants. By resorting to an overly restrictive standard of review, the court failed to give effect to the policy objectives of the Act. We hold that warrant applications submitted under the authority of 30 U.S.C. § 813 should be scrutinized under an administrative standard of probable cause. *See v. City of Seattle, supra.* As was done in this case, warrants actually issued should be carefully tailored, by limiting the items to be seized, to prevent the abuses inherent in "general, exploratory rummaging in a [company's] belongings." *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).

Reversed and remanded for further proceedings.

ENGEL, Circuit Judge, concurring.

While I find myself in general agreement with much of the majority opinion, certain issues relating to administrative searches and seizures covered therein are sufficiently troublesome to persuade me that we should save their resolution until the case arises which demands it. Since I am fully satisfied that the government's affidavits meet the more stringent standards of *Aguilar* and *Spinelli* and since this is sufficient to uphold the search and seizure in any event, I concur in reversal and remand.

13. The inspector saw a posted list of "voided" sampling cassettes and a brown book in one of the suspect mine offices during a routine inspection. Both of these items were described by the informant as instrumental in the illegal scheme.