**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**NEW ORLEANS PUBLIC SERVICE,
INC., Defendant-Appellant.**

No. 75–1130.

United States Court of Appeals,
Fifth Circuit.

June 6, 1977.

Michael J. Molony, Jr., New Orleans, La., for defendant-appellant.

Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., David L. Rose, Chief, Employ. Div., Civ. Rights Div., Dept. of Justice, Louis G. Ferrand, Jr., Naomi F. White, Attys., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Michael Farrell, E. Grady Jolly, Jackson, Miss., for amicus curiae.

Before AINSWORTH and CLARK, Circuit Judges, and HUGHES,* District Judge.

AINSWORTH, Circuit Judge:

Appellant, New Orleans Public Service, Inc. (hereinafter NOPSI), appeals from an adverse decision of the district court holding that NOPSI is a government contractor subject to Executive Order 11246,[1] and permanently enjoining NOPSI from failing and refusing to comply with the Order, as amended, and the implementing rules and regulations. Questions as to the force, coverage and enforcement of the Executive

Order are involved. The principal issue today before us is whether a public utility which, under a city permit, enjoys a local monopoly in the sale of electricity and a near-monopoly in the sale of natural gas and which sells such energy to the Government in substantial amount can be required by the Government to comply with the equal opportunity obligations of Executive Order 11246, even though the utility has not agreed to be so bound. We hold that the Government can compel such a utility to follow the Order; however, we disagree with the district court as to the appropriate remedy.

Executive Order 11246 prohibits employment discrimination by government contractors. The Order was issued by President Johnson in 1965, and requires that all covered government contracts contain a nondiscrimination clause, including an agreement to take affirmative action to achieve the equal opportunity goals of the Executive Order's mandate. *Id.* § 202.

NOPSI is a public utility which produces, distributes and sells electric power to consumers located in that part of New Orleans, Louisiana, on the east bank of the Mississippi River, and sells and distributes natural gas to consumers throughout the city. The company sells its gas and electricity pursuant to indeterminate permits,[2] like franchises, issued by the City Council of New Orleans. NOPSI is the only company with indeterminate permits to supply New Orleans with gas, and the east bank of the city with electricity. If any New Orleans consumer (including the Federal Government) on the east bank wishes to buy electric service, the consumer must purchase from NOPSI. NOPSI also provides most of the natural gas service to consumers (including the Federal Government) throughout the city,

---

\* Senior District Judge of the Northern District of Texas sitting by designation.

1. 30 Fed.Reg. 12319 (1965), 3 C.F.R. 339 (1964–1965 Compilation), *as amended by* Exec.Order No. 11375, 32 Fed.Reg. 14303 (1967), 3 C.F.R. 406 (1969), 42 U.S.C.A. § 2000e note (1974), *superseded in part (irrelevant for purposes herein) by* Exec.Order No. 11478, 34 Fed.Reg.

12985 (1969), 3 C.F.R. 133 (1969 Compilation), 42 U.S.C.A. § 2000e note (1974).

2. Under an indeterminate permit, the company is granted the right to supply such services indefinitely, but the grantor City Council retains the right to buy the utility operation from the company, thus terminating the permit.

and in those cases where companies receive their gas from other sources, NOPSI has agreed to the arrangement and has built and maintained the transmission line connecting the company with the parish boundary. The federal agencies which buy electricity from NOPSI are on the east bank, and have no alternative source of electric power. NOPSI is regulated by the City Council, which in 1973 granted the company rate increases for its electric and natural gas services to customers.

A number of federal agencies and installations in New Orleans are major purchasers of electricity and natural gas from NOPSI. In 1973 NOPSI supplied such federal users with nearly $2 million worth of electric utility service, and with more than $2,680,000 worth of electric and natural gas utility services combined. There are nine federal agencies which at the present time and during the period 1965–1973 each have received over $10,000 annually in combined gas and electric services from NOPSI; some of those each have received more than $50,000 in such utility services annually. The biggest user, the Michoud Assembly Facility (hereinafter Michoud) of the National Aeronautics and Space Administration (hereinafter NASA), alone received approximately $1.4 million worth of electricity and natural gas in 1973. The agencies are billed monthly and pay for the services on a regular basis.

According to the district court opinion, NOPSI supplies the Government with utility services pursuant to various contractual arrangements. The court found that NOPSI is supplying 22 federal agencies under written agreements. Some of those contracts predated the Executive Order, but the court found that they were modified by, *inter alia*, the 1973 revised rate schedules which were approved by the City Council; were applied to the particular contract by NOPSI; and were accepted, through payment, by the agency. A few of those contracts contained nondiscrimination clauses required by earlier Executive Orders. In the case of two agencies in the group, the Government had sent NOPSI a proposed new contract, containing the nondiscrimination clause required by Executive Order 11246, but NOPSI rejected the proposed contract on the ground that the clause was unsatisfactory. Other contracts were signed in 1972 or on dates not specified by the district court opinion and were modified by the revised rate schedules in 1973.

In addition, the district court found that NOPSI is supplying six other federal agencies pursuant to contracts which were not formal, written agreements. Some of those contracts, for example, were based on letter requests from the federal agencies; another was based on an oral agreement.

Somewhat more complicated is the relationship between NOPSI and NASA's Michoud facility. Disagreement in that relationship precipitated the instant litigation. NOPSI supplied Michoud with electricity and natural gas under a written contract between the utility and the space agency which was signed in 1965 and terminated according to its own terms in June 1970. That contract contained an equal opportunity clause which was required by Executive Order 10925, the predecessor of Executive Order 11246. The contract also contained a limitation clause restricting the scope of the contract to the Michoud operations. Because of the NASA–NOPSI relationship involving utilities service at Michoud, the Government has tried in the past to review NOPSI's compliance with Executive Order 11246, but NOPSI has resisted on the ground that it was not covered by the Order. Attempts between the Government and NOPSI to negotiate a new utilities contract for Michoud broke down, with the Government unwilling to agree to a scope limitation like that in the 1965 contract, and NOPSI unwilling to agree to an equal opportunity clause without such a limitation. Nevertheless, NASA asked NOPSI to continue supplying Michoud, and NOPSI has continued to do so even though the formal contract has expired, subject to the rate schedules set out by NOPSI at the time of the termination of the written contract. The district court, after surveying the pre-

ceding facts, held that a contract existed between NASA and NOPSI.[3]

The Government's efforts to conduct a compliance review of NOPSI began in 1969, and further unsuccessful attempts were made through 1972. This action was initiated by the Government through the Justice Department in 1973 to compel NOPSI's compliance with the Executive Order. After holding that NOPSI was covered by the Order, the district court permanently enjoined the utility from failing or refusing to comply with the Order and implementing regulations. The injunction reached NOPSI's refusal to allow the Government to conduct compliance reviews of NOPSI, and authorized the parties to begin discovery. In addition, the court retained continuing jurisdiction to effectuate NOPSI's full compliance with the Executive Order.

## I. The Validity and Applicability of the Executive Order

### A. The Executive Order Program

The Executive Order requires that every nonexempt government contract contain a clause under which the employer agrees not to discriminate in employment on the basis of race, color, religion, sex or national origin, and further agrees to take affirmative action to achieve the equal opportunity objective. Exec. Order No. 11246, § 202(1). The Secretary of Labor is responsible for the administration of the federal contract compliance program, and is empowered to issue rules and regulations to implement the Order. *Id.* § 201. In addition to the nondiscrimination clause, the required contract provision stipulates that the contractor will comply with all provisions of the Order and the implementing rules and regulations, *id.* § 202(4), that he will furnish all the information and reports[4] required by

the Order and the regulations and that he will permit access to his books and records by the contracting agency and the Secretary of Labor in order that they may determine his compliance. *Id.* § 202(5).

The Secretary of Labor is given various powers under sections 205 to 208 to carry out his mandate, including the authority to investigate the employment practices of government contractors. *Id.* § 206. Elsewhere the Order sets out various sanctions and penalties, one of which is that the Secretary of Labor may recommend to the Justice Department that it enforce by appropriate proceedings, including suits for injunctive relief, the provisions of the required nondiscrimination clause. *Id.* § 209(a)(2). Before such proceedings are initiated, though, the Order directs that "[u]nder rules and regulations prescribed by the Secretary of Labor," the contracting agency shall make reasonable efforts to achieve compliance by "conference, conciliation, mediation, and persuasion." *Id.* § 209(b).

For purposes of the instant case, the critical—and disputed—provision of the federal contract compliance program is found in the Secretary of Labor's regulations, 41 C.F.R. § 60–1, *as amended by* 42 Fed. Reg. 3454, *et seq.* (1977), and states:

> (e) *Incorporation by operation of the Order.*—By operation of the Order, the equal opportunity clause shall be considered to be a part of every contract and subcontract required by the Order and the regulations in this part to include such a clause whether or not it is physically incorporated in such contracts and whether or not the contract between the agency and the contractor is written. § 60–1.4(e).[5] *Cf. id.* § 60–1.4(d) (incorporation by reference). The "equal opportunity

**3.** The facts indicating the circumstances under which NOPSI supplied energy to the various government agencies are laid out fully in the district court's opinion, and are incorporated herein except insofar as they indicate specific contractual arrangements between NOPSI and the Government. The long-standing seller-purchaser relationship indisputably makes NOPSI a government contractor, and further contrac-

tual underpinning is unnecessary for our holding.

**4.** Section 203 of the Order requires the filing of compliance reports by the contractor.

**5.** We note that, although certain changes in the regulations have occurred as a result of the 1977 amendments, the result we reach today

clause" referred to in the regulation is the nondiscrimination clause set forth in the Executive Order. "Contract" means any "government contract," and "government contract" is defined to include "any agreement or modification thereof between any contracting agency and any person for the furnishing of supplies or services." *Id.* § 60–1.3. The term "services," as used in the regulation, includes utility services. *Id.* Executive Order 11246 states in section 202 that the Order applies to every government contract entered into after the effective date unless the contract is specifically exempted under section 204. No such exemption is applicable in the instant case.[6] Therefore, assuming no problems concerning the Order's basic validity or its application herein, NOPSI is clearly subject to the requirements of the program.

### B. NOPSI's Argument

NOPSI argues that the Executive Order and the regulations do not give the Labor Department's Office of Federal Contract Compliance—the agency which administers the Executive Order—authority to compel the company to fulfill the affirmative action obligations of the program. In support of its position, NOPSI offers three arguments which speak to the validity of the regulations as herein applied, from the point of view of both executive power and general contract law.

First, NOPSI points out that it did not seek the Government's business or any government contracts. NOPSI contends that the relevant judicial decisions on the Executive Order all involved employers that sought the Government's business, *e. g.*, by bidding for government contracts, or were unquestionably government contractors, and that each case therefore presented an element of consent which is here lacking. Second, the company argues that it has consistently refused to accept the Order's affirmative action obligation. This argument, related to the first, assumes the necessity of NOPSI's consent in order for the company to be bound by the nondiscrimination clause. Third, NOPSI contends that it is not furnishing energy to the Government pursuant to any contract, but instead is supplying such energy pursuant to its franchises, granted by the City, which require NOPSI to provide power to all consumers who request it. Under that argument, NOPSI's status as a City franchisee precludes its having the status of a Federal Government contractor, given the fact that NOPSI has refused to accede to the contract terms required by the Government. Accordingly, NOPSI and amicus Mississippi Power & Light Company, appellant in No.

---

would be the same whether or not the new regulations were in effect. Furthermore, we would apply the current version of the regulations in any event, since this appeal involves both a program requiring present compliance by NOPSI and a continuing injunctive order of the district court.

The language of the provision cited in the accompanying text reflects a minor change. The Labor Department's comments state:

> The effect of the change in § 60–1.4(e) is to make it clear that, consistent with the intent of the Secretary and with existing case law, the equal opportunity clause is considered a part of all nonexempt contracts, including unwritten contracts. . . .

42 Fed.Reg. 3454 (1977).

**6.** Section 204 of the Order provides that the Secretary of Labor may grant an exemption to a specific contract because of "special circumstances," or may exempt

> facilities of a contractor which are in all respects separate and distinct from activities

of the contractor related to the performance of the contract: *Provided,* That such an exemption will not interfere with or impede the effectuation of the purposes of this Order.

. . . .

No such exemption has been granted to NOPSI. Section 204(3) also provides for a class exemption, by rule or regulation, for contracts involving less than specified amounts of money. A contract which exceeds $10,000 (or a contract of a government contractor having an aggregate total of government contracts within a twelve-month period in excess of $10,000) is not exempt under section 204(3) from the requirements of the nondiscrimination clause. 41 C.F.R. 60–1.5, 42 Fed.Reg. 3454, 3459 (1977). Therefore, NOPSI is a nonexempt contractor. The effective date of the Order causes no problem since the case involves a contractual relationship which, in particular instances, has been renewed or modified by the parties since such effective date. *See* discussion *infra.*

75–2590, 5 Cir., 1977, 553 F.2d 480, the companion case which we also decide today, challenge the application of the Executive Order both on the ground that it conflicts with the contractual principle of consent, and that it is action taken without authority from Congress.

## C. The Program's Force and Effect

■ The starting point of our analysis is the well-established proposition that the Order has the force and effect of law. *Southern Ill. Builders Ass'n v. Ogilvie,* S.D.Ill., 1971, 327 F.Supp. 1154, *aff'd,* 471 F.2d 680 (7 Cir., 1972); *Joyce v. McCrane,* D.N.J., 1970, 320 F.Supp. 1284; *U. S. v. Local 189, United Papermakers & Paperworkers,* E.D. La., 1968, 282 F.Supp. 39; *see Contractors Ass'n of Eastern Pa. v. Secretary of Labor,* 3 Cir., 1971, 442 F.2d 159, *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95. *Cf. Farkas v. Texas Instrument, Inc.,* 5 Cir., 1967, 375 F.2d 629, *cert. denied,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (involved predecessor order, No. 10925); *Farmer v. Philadelphia Elec. Co.,* 3 Cir., 1964, 329 F.2d 3 (involved No. 10925 and prior orders). From that proposition flows our ultimate conclusion as to the validity of applying the Order to NOPSI in the instant case.

This circuit has held that Executive Order 10925, the predecessor of No. 11246, was issued pursuant to statutory authority because of the relationship between the anti-discrimination provision in the Order and the purposes of 40 U.S.C. § 486(a), the statute governing, *inter alia,* government procurement. *Farkas, supra,* 375 F.2d at 632 n. 1. More recently, the Third Circuit concluded that that statute supplied the express or implied authorization of Congress for the Executive Order today before us, as applied to government procurement. *Contractors Ass'n, supra,* 442 F.2d at 170.

■ Additional indicia of congressional support for the Labor Department's Executive Order program are discussed below, and furnish legal underpinning not only for the Executive Order, but for the regulation in dispute, 41 C.F.R. § 60–1.4(e), 42 Fed. Reg. 3454, 3459 (1977), as well. That is

because an Executive Department regulation which is issued pursuant to an act of Congress and by the department responsible for the administration of the statute has the force and effect of law if it is not in conflict with an express statutory provision. *Maryland Cas. Co. v. United States,* 251 U.S. 342, 349, 40 S.Ct. 155, 157–58, 64 L.Ed. 297 (1920); *see G. L. Christian & Assoc. v. United States,* 1963, 312 F.2d 418, 424, 160 Ct.Cl. 1, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314. We perceive no such conflict in the instant case.

■ Furthermore, the appropriate measure of the regulation's validity is whether it was within the scope of the Executive Order. *See Contractors Ass'n, supra,* 442 F.2d at 175. In deciding that question, we give special deference to the Labor Department's interpretation of the Order which that department was charged to administer. *Id.; see Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *cf. Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971); *Power Reactor Dev. Co. v. International Union of Elec., Radio & Mach. Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961). The Executive Order specifically authorized the issuance of implementing regulations by the Secretary of Labor, and the disputed provision, 41 C.F.R. § 60–1.4(e), did nothing more than give teeth to the mandate of the Order. The regulation was thus within the scope of the presidential directive in so implementing it. Under the preceding principles of strong deference to administrative interpretation, we also find that the Department acted within the scope of the Order in applying the Order to NOPSI.

## D. Executive and Legislative Action

As indicated earlier, the first strand of NOPSI's argument—namely, the contention that the Government acted without authority in this case—has to do with executive power. Yet that contention ignores the fact of a long-entrenched government program, set in motion and continually kept alive by a series of presidents and approved

by Congress. The Executive Order program prohibiting employment discrimination by government contractors has been in effect since World War II. President Franklin D. Roosevelt issued the first such Executive Order, and each of his successors has followed suit. *See Contractors Ass'n, supra,* 442 F.2d at 168–71.

Roosevelt's initial prohibition, Executive Order 8802, 3 C.F.R. 957 (1938–1943 Compilation), required a nondiscrimination clause in all defense contracts. Pursuant to a subsequent statute intended to expedite the war effort, Roosevelt issued Executive Order 9001, 3 C.F.R. 1054 (Compilation 1938–1943), which stated that a nondiscrimination clause would be deemed incorporated by reference in all defense contracts covered by the statute. Executive Order 9346, 3 C.F.R. 1280 (1938–1943 Compilation), issued in 1943, required the inclusion of a nondiscrimination clause in all government contracts, not just in defense contracts. However, that Order was still based upon the President's war mobilization powers. *Contractors Ass'n, supra,* 442 F.2d at 169. Executive Orders 8002 and 9346 were continued by President Truman in 1945. Exec. Order No. 9664, 3 C.F.R. 480 (1943–1948 Compilation). Six years later, the President signed an order continuing the provision that a nondiscrimination clause would be deemed incorporated by reference in all defense contracts, Exec. Order No. 10210, 3 C.F.R. 390 (1949–1953 Compilation), and the President, still acting under his war powers, issued another series of Executive Orders extending Executive Order 10210 to additional government agencies, other than the Department of Defense, engaged in defense-related procurement. *Contractors Ass'n, supra,* 442 F.2d at 169. President Eisenhower issued Executive Orders which broadened the contract compliance program, and, significantly, those orders were not issued pursuant to the President's power over defense production. *Id.* at 170. In 1961, President Kennedy issued Executive Order 10925, 3 C.F.R. 448 (1959–1963 Compilation), inserting "affirmative action" language in a nondiscrimination clause required in all government contracts. And President Johnson in 1965 issued Executive Order 11246, transferring to the Secretary of Labor certain compliance functions previously vested in the President's Committee on Equal Employment Opportunity, and continuing the affirmative action requirement.

Although the Labor Department's federal contract compliance program originated by Executive Order, rather than by legislation, Congress has considered the program on several occasions. At the least, there has been implied congressional approval of the program; it can even be argued that there has been express ratification. The Government correctly identifies three sources of legislative authorization for the Executive Order.

First, the President has express authority over direct federal procurement practices, under 40 U.S.C. § 486(a).[7] While some presidents acted pursuant to their war powers in promulgating Executive Orders concerning employment discrimination by government contractors, the President's broad statutory procurement power has been held to be authorization for other Executive Orders which were not related to war production. *See Contractors Ass'n, supra,* 442 F.2d at 169–71; *Farkas, supra,* 375 F.2d at 632 n.1. Furthermore, more recent decisions involving Executive Order 11246 have candidly acknowledged the validity of the use by the President or Congress of the procurement process to achieve social and

---

**7.** That provision authorizes the President to prescribe policies and directives to implement the Federal Property and Administrative Services Act of 1949, which deals with the management (including the procurement) and disposal of government property. Mississippi Power & Light argues that, assuming *arguendo* the validity of the Executive Order with respect to the procurement statute, the Order is nonetheless invalid under the Administrative Procedure Act, 5 U.S.C. § 500, *et seq.,* for lack of both publication of the Order and notice of a hearing. Missis;ippi Power & Light apparently relies on 5 U.S.C. § 553. However, as the Government points out, rules relating to public contracts are expressly excepted from the requirements of that provision. *Id.* § 553(a)(2).

economic objectives. *See Rossetti Contracting Co. v. Brennan,* 7 Cir., 1975, 508 F.2d 1089, 1045 n.18; *Northeast Const. Co. v. Romney,* 1973, 157 U.S.App.D.C. 381, 485 F.2d 752, 760. Those cases stand for the proposition that equal employment goals themselves, reflecting important national policies, validate the use of the procurement power in the context of the Order.

The second source of legislative authorization is Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* A reference in the Act, as originally enacted, *id.* § 2000e–8(d), to the Executive Order program indicated congressional intent that the program would continue in existence. *See Contractors Ass'n, supra,* 442 F.2d at 171. This reading of congressional intent is further supported by the decision of Congress at that time not to make Title VII the exclusive federal remedy in this area. *See* 110 Cong.Rec. 13650–52 (1964); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Sanders v. Dobbs Houses, Inc.,* 5 Cir., 1970, 431 F.2d 1097, *cert. denied,* 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971).

■ Third, the debates surrounding the Equal Employment Opportunity Act of 1972, Pub.Law No. 92–261, 86 Stat. 103, which amended Title VII, offer additional evidence of congressional approval. For example, legislative sentiment in support of

the Executive Order program surfaced in successful opposition to a renewed attempt to make Title VII the exclusive federal remedy. *See* 118 Cong.Rec. 3371–73 (1972) (remarks of Senator Williams); *id.* at 3962, 3964 (remarks of Senator Javits). Additional support can be inferred from the defeat of a proposal to transfer the program to the Equal Employment Opportunity Commission. *See id.* at 1387–98. Other aspects of the Act which were enacted into law illustrate congressional contemplation of the program's continuance. *See, e.g.,* 42 U.S.C. §§ 2000e–14, 2000e–17. To be sure, the legislative history does not show, in so many words, congressional ratification of the particular aspect of the Executive Order program here at issue, *viz.,* the imposition by operation of the Order of the non-discrimination clause on all government contractors, regardless of whether the employers have expressly consented to the clause. However, Congress not only has refused to circumscribe the role of the Office of Federal Contract Compliance in combating employment discrimination, but has indicated a concern for the efficacy of such efforts and an intent that they would continue. The regulation in controversy is an integral part of a long-standing program which Congress has recognized and approved. We have no difficulty, therefore, in finding congressional authorization for the provision.[8] It follows that the applica-

8. NOPSI argues that application of the Executive Order herein contravenes the principle in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), in which the Supreme Court held that President Truman's seizure of the steel mills was unlawful. In *Youngstown,* however, Congress had refused to authorize governmental seizure of property as was therein attempted. Therefore, the President had acted in the face of that congressional decision and in the absence of any other power authorizing his action. *See* 343 U.S. at 585–89, 72 S.Ct. at 866–67. The instant case is thus distinguishable, since the Executive acted here pursuant to congressional authorization. The application of the Order today before us falls within the first category of executive power—that of maximum power—which Justice Jackson identified in his concurring opinion in *Youngstown,* 343 U.S. at 635–37, 72 S.Ct. at 870–71; *see Contractors Ass'n,*

*supra,* 442 F.2d at 168–71. Furthermore, the analogy to a seizure is manifestly imprecise.

At oral argument, NOPSI also cited *NAACP v. FPC,* 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976), in which the Supreme Court held that the Federal Power Commission did not have authority under the Federal Power Act and the Natural Gas Act to issue a rule prohibiting discriminatory employment practices by the agency's regulatees. However, *FPC* does not aid appellant's position. The opinion does not hold that an agency cannot issue regulations concerning affirmative action, assuming the agency has a statutory basis for doing so, nor does it suggest that issuance of such regulations is prohibited unless Congress has authorized the agency to promulgate them. Furthermore, the Court did not hold that the FPC indirectly could regulate discriminatory employment practices by its regulatees, to the extent that such practices demonstrably affected a regulatee company's labor costs. *Id.,* 425 U.S. at

tion of the Order to NOPSI is also authorized, for such action requires no extension of the regulation's coverage. The regulation incorporating by operation of the Order the nondiscrimination clause into every government contract would be a dead letter if the Government could not apply it to a government contractor like NOPSI, merely because the company refused to consent.

Although no circuit has confronted the precise legal issue today before us, we find the *Contractors Ass'n* case to be a very persuasive precedent. There the Third Circuit specifically considered the validity of the Philadelphia Plan, relating to minority hiring in federally-assisted construction projects, which was promulgated pursuant to Executive Order 11246. The court upheld the Plan, on the ground that it was within the implied authority of the President. Insofar as the Philadelphia Plan was instituted to implement the mandate of the Executive Order in a particular geographic area and industry, the court's holding clearly flowed from a view that the Executive Order program itself was valid, at least with respect to federally-assisted construction contracts. Moreover, in language on all fours, the Third Circuit specifically stated that Executive imposition of nondiscrimination contract provisions (including an af-

firmative action clause) in the Government procurement area is action pursuant to the express or implied authorization of Congress. 442 F.2d at 170.

In response to the argument that a decision for the Government in this case would go beyond the Third Circuit's holding in *Contractors Ass'n*, we believe that our decision today fits within that precedent and, in fact, approves a more confined power than did the *Contractors Ass'n* court. We here impose the nondiscrimination obligation on a company which, as a public utility, holds City-granted franchises and, pursuant thereto, (1) enjoys special economic advantages, including a monopoly, and (2) sells directly to the Government. To so apply the provision is far easier, in our judgment, than to apply it, as in *Contractors Ass'n*, to a mere bidder for federally-assisted construction project contracts. The ease of application is a function of both the Government's legal power and the utility's economic power in their direct contractual relationship.

## E. Contract Law

The second aspect of NOPSI's attack on the Executive Order as herein applied focuses on contract law. The company con-

---

666–670, 96 S.Ct. at 1810–11. Therefore, under *FPC*, a government agency can regulate discriminatory employment practices to the extent that such discrimination is related directly to the agency's functions. That principle should be read in light of *Rosetti Contracting* and *Northeast Constr.*, which involve the Executive Order herein and require only a loose relationship between the noneconomic objective, *i.e.*, regulating employment discrimination, and the procurement function. *Rosetti Contracting, supra,* 508 F.2d at 1045 n.18; *Northeast Constr., supra,* 485 F.2d at 760–61. We also note Mississippi Power & Light's citation of *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), apparently to rebut the proposition that Congress ratifies executive orders by subsequently recognizing their existence and making reference to them. However, to the extent that the Supreme Court addressed this issue in *Mow Sun Wong,* the opinion turned on the particular facts in controversy. That case involved, *inter alia,* the question whether acquiescence by the Executive and Congress in a Civil Service Commis-

sion policy imposing a citizenship requirement on federal employees was sufficient to give the Commission rule the same support as an express statutory or presidential command. The Court held that neither appropriations acts nor executive orders in which Congress and the President, respectively, had considered the policy and spoken to it in some fashion could fairly be read as evidencing either approval or disapproval of the policy by either branch. *Id.* 426 U.S. at 104–114, 96 S.Ct. at 1906–10. The opinion makes clear, though, that the legislative history and executive orders there in dispute could arguably be taken either way, *i.e.,* they might be read as evidencing either disapproval or approval, and it was that ambiguity which gave rise to the Court's statement. Thus, *Mow Sun Wong* is clearly distinguishable from the case at bar. The legislative history behind the program today before us lacks such ambiguity as dictated the *Mow Sun Wong* result. Furthermore, the cited case lacked the clear directive from the Executive—by Executive Order—which is the very source of the program we confront and uphold herein.

tends that its lack of consent to be bound by the nondiscrimination clause distinguishes the prior cases involving the validity of the Order. Whatever, if any, authorization exists for the program is vitiated when, as here, it is imposed on a nonconsenting public utility, the company argues, because the contractual consent principle is violated. We disagree.

We find that the absence of NOPSI's consent to the Executive Order is not determinative, and does not render the prior caselaw distinguishable. Furthermore, we reject the company's contention that NOPSI is not a government contractor.

■■■■ Government contracts are different from contracts between ordinary parties. *See M. Steinthal & Co. v. Seamans*, 1971, 147 U.S.App.D.C. 221, 455 F.2d 1289, 1304. *See also* Vacketta & Wheeler, *A Government Contractor's Right to Abandon Performance*, 65 Geo.L.J. 27 (1976). The Government has the unrestricted power to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases. *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940); *Southern Ill. Bldrs. Ass'n v. Ogilvie*, S.D.Ill., 1971, 327 F.Supp. 1154, *aff'd*, 471 F.2d 680 (7 Cir., 1972); *cf. King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *Vacketta & Wheeler, supra.* Agreement to such conditions is unnecessary: where regulations apply and require the inclusion of a contract clause in every contract, the clause is incorporated into the contract, even if it has not been expressly included in a written contract or agreed to by the parties. *M. Steinthal, supra*, at 1304; *J. W. Bateson Co. v. United States*, 1963, 162 Ct.Cl. 566, 569; *G. L. Christian, supra*, 312 F.2d at 424; *see Russell Motor Car Co. v. United States,* 261 U.S. 514, 43 S.Ct. 428, 67 L.Ed. 778 (1923). *See also De Laval Steam Turbine Co. v.*

*United States,* 284 U.S. 61, 52 S.Ct. 78, 76 L.Ed. 168 (1931); *College Point Boat Corp. v. United, States,* 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925).[9]

A contractual relationship obviously exists between NOPSI and the Government, notwithstanding the company's attempt to disclaim government-contractor status. This contractual relationship exists by virtue of the fact that the company sells millions of dollars worth of utility services to various agencies of the Federal Government, and has done so for many years. The district court's extensive factual findings as to particular contracts aids us in this determination; however, we would reach it even in the absence of any oral or written agreements to particular terms, because the relationship so clearly reflects a contract.

Furthermore, we cannot understand how NOPSI seriously can deny status as a government contractor for the reason that it is supplying utility services to the Government pursuant to local franchises which require the company to furnish such energy to all consumers who request it. That the company services customers under local franchises does not negate the obvious fact that NOPSI renders such services to individual customers pursuant to contracts, whether written or parol, and whether explicit or implicit in the parties' course of dealing.

NOPSI's status as a public utility, operating under local franchises granted by the City of New Orleans, and providing services to the United States, renders the utility's express consent unnecessary in light of the Executive Order. Acceptance of the benefits of the local franchises subjected NOPSI to the obligations attached thereto. *Cf. Almeida-Sanchez v. United States,* 413 U.S. 266, 271, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973). When NOPSI undertook to satisfy those obligations by selling energy to the

**9.** A contract between the Government and one of its contractors need not be in writing in order to be enforceable. *See, e.g.,* Patten, *Government Contracts—Are They Enforceable If Not in Writing?,* 7 Pub. Contract L.J. 232 (1975). Similarly, the applicability of the Exec-

utive Order to NOPSI does not depend upon the existence of a formal written contract. We do not say today that no such contract exists between NOPSI and the Government, since resolution of that question is unnecessary to our holding.

Government, the company did so according to the terms imposed by the Government.[10]

■ NOPSI implies, in addition, that because of its public-utility status, imposition of the Executive Order's requirements would be unfair. The unfairness, the company suggests, stems from NOPSI's lack of choice as to whether to accept the Government's business. However, the fact that NOPSI is a public utility militates strongly in *favor* of allowing the Government to impose the obligations of the Executive Order on the company. NOPSI's franchises give it a local monopoly in the sale of electricity and a near-monopoly in the sale of natural gas. A monopolistic government supplier, unlike a seller in an ordinary market, has the economic power to resist the Executive Order. In the situation under consideration, the Government needs to buy electric energy in the New Orleans area. If NOPSI were allowed to prevail in its contentions, the Government would have to either acquiesce or else go without necessary services. Obviously, a local utility cannot force such a dilemma upon the Government. Otherwise, a valid and important nationwide federal program, set in place by the President over a third of a century ago, continued by every one of his successors, approved by Congress and applicable to all government contractors, could be nullified by any seller with a monopoly in a service, supply or property needed by the Government, just by virtue of the seller's economic position. Here, NOPSI's monopoly exists only because of local legislative action. The supremacy clause of the Constitution obviously cannot countenance such a result. We hold, therefore, that the Government can compel NOPSI to comply with the equal opportunity obligations of Executive Order 11246, even though the company has not expressly consented to be bound by that Order.

10. We are not inferring here any implied or constructive agreement by NOPSI to the terms of the Executive Order. Our holding is dictated by (1) the sale by the company of energy to the Government, *and* (2) the fact that such sale of services was made by a company which, under

## II. NOPSI's Fourth Amendment Contentions

NOPSI next contends that the Executive Order and implementing regulations violate the fourth amendment when applied to a public utility which does not seek to do business with the Government and has not consented to the provisions of the Order. This argument parallels the company's central contention in the case, and is similarly without merit.

Section 202(5) of the Executive Order requires that all covered government contracts include a term whereby the contractor agrees to furnish all information and reports called for by the Order and implementing regulations, and to permit access to its (the contractor's) books and records by the contracting agency and the Secretary of Labor in order to determine whether the contractor is complying with the program. That provision is effectuated by 41 C.F.R. § 60–1.43, requiring that each contractor

> permit access during normal business hours to its premises for the purpose of conducting on-site compliance reviews and inspecting and copying such books, records, accounts and other material as may be relevant to the matter under investigation and pertinent to compliance with the Order . . . .

NOPSI contends that enforcement of these provisions herein would constitute an unreasonable search and seizure, in contravention of the rule enunciated in *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). The company's argument ignores the post-*See* development by the Supreme Court of administrative search doctrine, not to mention certain pre-*See* precedents. *See, e. g., United States v. Morton Salt Co.,* 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950); *Oklahoma Press Pub. Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946).

City franchises, enjoyed a local monopoly in such services needed by the Government. The presence of both those elements triggered the regulation, 41 C.F.R. § 60–1.4(e), and thus, the application of the program's obligations by operation of the Order.

In *See* the Court applied the fourth amendment warrant requirement to commercial as well as residential premises, in the context of administrative code-enforcement inspections. The Court held only that an unconsented administrative entry upon the nonpublic areas of a commercial premises "may only be compelled through prosecution or physical force within the framework of a warrant procedure." *Id.,* 387 U.S. at 545, 87 S.Ct. at 1740. The *See* Court explicitly pointed out that it did not question "such accepted regulatory techniques as licensing programs which require inspections prior to operating a business or marketing a product." *Id.,* 387 U.S. at 546, 87 S.Ct. at 1741.

The Court drew upon the latter theme in *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), recognizing a broad congressional authority to fashion rules concerning the supervision and inspection of the liquor industry, based upon a long history of regulation of that industry. This authority, the Court held, included the power to determine legislatively the standards of reasonableness for searches conducted pursuant to a liquor regulatory system. *Id.,* 397 U.S. at 77, 90 S.Ct. at 777.[11]

The Supreme Court went one step further in *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), upholding a warrantless search of a firearms dealer under the federal gun control statute. In *Biswell* the Court could not rely on a deep-rooted pattern of federal regulation to justify the inspection system there in contention. However, the Court found that the system could be sustained because "[l]arge interests are at stake, and inspection is a crucial part of the regulatory scheme." *Id.,* 406 U.S. at 315, 92 S.Ct. at 1596. The same rationale controls the present case. The Government has a vital interest in achieving equal employment opportunity. The Executive Order program is designed to carry out that interest, at least with regard to the Government's own contractors. And some sort of compliance process (including procedures for the inspection of company books and records and for access to company facilities) is necessary in order to make the program work.

■ The *Biswell* Court, deciding not to use the dealer's submission to the search there at issue as the justification for upholding such a search, declared that "the legality of the search depends not on consent but on the authority of a valid statute." *Id.,* 406 U.S. at 315, 92 S.Ct. at 1596. That reasoning answers NOPSI's argument about lack of consent herein. As we indicated earlier in this opinion, the Executive Order and its implementing regulations have the force and effect of law, were implemented pursuant to statutory procurement authority and have been approved by Congress since being issued. Therefore, they play the same validating role as a statute. Moreover, the *Biswell* decision is premised, to a certain extent, on the idea of implied consent, *i. e.,* that such a regulated dealer, in choosing to engage in a pervasively regulated business and to accept a federal license, did so with the knowledge that it would be subject to inspection. *Id.,* 406 U.S. at 316, 92 S.Ct. at 1596. Obviously, we do not find actual consent to the inspection system at bar. However, there is no policy justification for distinguishing between, on the one hand, a federally-licensed firearms dealer and, on the other, a public utility which, under City-granted franchises, enjoys a local monopoly and sells substantial amounts of energy to the Government, thus bringing the utility within the coverage of the federal contract compliance program. Therefore, we have no difficulty in applying, for fourth amendment purposes, the implied-consent concept of the cases involving administrative inspection of regulated businessmen, *see, e. g., Almeida-Sanchez v. United States,* 413 U.S. 266, 271, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973), even

---

**11.** Although the Court in *Colonnade Catering* condemned warrantless entries under the system there in controversy, it is important to note, first, that the decision turned on statutory construction, and second, that the case involved a forceful entry—a situation we do not confront today.

though that concept is a legal fiction. Our reasoning is consistent with the rule earlier announced in this circuit that where, as here, the Government validly regulates any business, the Government has a right to include in its regulations the requirement that certain records be kept open to official inspection so that the administrative agency can determine whether the company is complying. *See Ray v. United States,* 5 Cir., 1967, 374 F.2d 638, 641–42 (*citing* 79 C.J.S. Searches & Seizures § 36, at 803), *cert. denied,* 389 U.S. 833, 88 S.Ct. 35, 19 L.Ed.2d 94 (1967); *cf. Morton Salt, supra; Oklahoma Press, supra.* We note finally that, under the inspection procedure contemplated by the Executive Order program, "the possibilities of abuse and the threat to privacy are not of impressive dimensions," *see Biswell, supra,* 406 U.S. at 317, 92 S.Ct. at 1597, and accordingly, we sustain the program against attack on fourth amendment grounds.[12]

## III. The District Court's Injunctive Order

We turn finally to NOPSI's disagreement with the district court's injunctive order. The company argues that the court lacked jurisdiction to issue that order, under which the court retained jurisdiction over this action for the purpose of enforcing the substantive provisions of the Executive Order.

■ We hold that, the district court having found NOPSI to be covered by the Executive Order, the task of obtaining NOPSI's compliance with the program should be left to the Government's own administrative compliance processes. Accordingly, we modify that part of the district court's opinion which retained jurisdiction over this suit and which dictated a mandate of injunction clearly contemplating substantive enforcement of the Executive Order. Our decision is based on equitable considerations, and should not be read as holding that the district court lacked jurisdiction in any respect for its ruling. Resolution of NOPSI's objections to the court's injunctive order is therefore unnecessary to our holding; however, we proceed to dismiss all of the company's present objections in order that they may not be interposed again as obstacles to enforcement of the program herein.

NOPSI makes two major arguments in this regard. The first is that the Government has failed to follow the procedural requirements of the Executive Order and implementing regulations. NOPSI alleges that the Government was required to proceed by conciliation and persuasion, but instead chose to pursue litigation in its compliance strategy. In addition, NOPSI contends that the Government has failed to

---

**12.** Mississippi Power & Light argues that the Executive Order's provision for Government access to a contractor's books and records is unconstitutional because: (1) the provision is without statutory authorization, and (2) it does not contain a procedure for judicial review. The argument about lack of statutory authorization is without merit in light of the pattern of congressional approval for the Executive Order program which we found in section I of this opinion. The argument about lack of judicial review is also without merit since, in the setting of the instant controversy, it is purely hypothetical. Here there has been no attempt to obtain access by force to the company's records without judicial approval; in fact, there has been ample judicial review in these proceedings of the Government's attempt to conduct a compliance review of NOPSI.

Since oral argument, Mississippi Power & Light has called our attention to *Brennan v. Gibson's Products, Inc.,* E.D.Tex., 1976, 407 F.Supp. 154, *appeal docketed,* No. 76–1526 (5 Cir. Feb. 27,

1976), a case in which a three-judge court held that an attempt by Department of Labor officials to conduct a warrantless inspection of a business, pursuant to the Occupational Safety and Health Act of 1970, violated the fourth amendment. However, *Gibson's Products* does not deter us from the conclusion we have reached. As the three-judge court pointed out, the company involved there was not licensed and had no history of close regulation, and the statutory provisions which appeared to authorize the search were not limited to such businesses, but instead embraced "the whole spectrum of unrelated and disparate activities which compose private enterprise in the United States." *Id.,* 407 F.Supp. at 161–62. Furthermore, there was no reason to believe that the thing sought to be controlled by the regulatory system before the court existed in the area to be searched. *Id.* at 162. Therefore, *Gibson's Products* is manifestly distinguishable from both the instant case and those cases upon which we have relied.

afford the company a hearing mandated under the program. In support of these assertions, NOPSI relies on a number of regulatory provisions. We need not respond to each assertion specifically, in view of the fact that the Government's attempts to conduct a voluntary compliance review of NOPSI date back to 1969.

The regulations now in effect [13] provide for the institution of administrative *or* judicial enforcement proceedings in response to violations of the Executive Order. Violations may be found, based upon, *inter alia*,

> (iv) a contractor's refusal to submit an affirmative action program; (v) a contractor's refusal to allow an on-site compliance review to be conducted; (vi) a contractor's refusal to supply records or other information as required by these regulations . . . or (vii) any substantial or material violation or the threat of [such] a . . . violation of the contractual provisions of the Order, or of the rules or regulations issued pursuant thereto.

41 C.F.R. § 60–1.26(a)(1). The district court found such a violation. The regulations further provide that whenever the Director of the Office of Federal Contract Compliance has reason to believe that there exists the threat or fact of violation of the Order or regulations, the Director

> may institute administrative enforcement proceedings . . . *or* refer the matter to the Department of Justice to enforce the contractual provisions of the Order, to seek injunctive relief . . . and to seek such additional relief, including back pay, as may be appropriate. *There are no procedural prerequisites to a referral to the Department of Justice* by

the Director, and *such referrals may be accomplished without proceeding through the conciliation procedures* in this chapter, *and a referral may be made at any stage in the procedures* under this chapter.

*Id.* § 60–1.26(a)(2) (emphasis added).

■ The preceding regulation plainly rebuts NOPSI's first contention.[14] And the regulation also refutes NOPSI's second major assertion, which is that the Justice Department cannot bring judicial proceedings to enforce the provisions of the Executive Order until the OFCC or the compliance agency (here the General Services Administration) has first exhausted the administrative procedures of the program. Two more observations are in order as to the exhaustion argument. First, the cases cited by NOPSI in support of that contention involve private actions and are, therefore, inapposite to the situation where the Government itself has decided to pursue judicial litigation in enforcing Executive Order 11246.[15] Second, while we recognize that, as NOPSI argues, substantial arguments can be mustered for application of the exhaustion doctrine, we nevertheless have no reason to read an exhaustion requirement into a program which clearly and deliberately provides judicial enforcement as an alternative to administrative enforcement, and which explicitly rejects procedural prerequisites to judicial enforcement.

■ Despite our conclusion that the district court had both the jurisdiction and the power to direct by injunctive order NOPSI's compliance, we conclude that the enforcement function in this case would be better carried out administratively by the compliance agencies. This decision is

---

**13.** *See* note 5 *supra.*

**14.** As to NOPSI's argument that the Government was required to proceed by conciliation and persuasion, we think that the facts described at the outset of our opinion indicate that such efforts took place. In addition, we find no conflict between 41 C.F.R. § 60–1.26(a)(2) and section 209(b) of the Executive Order. While section 209(b) directs the contracting agency to make reasonable efforts to achieve compliance by conciliation and persuasion, those efforts are to be made pursuant to the regulations

issued by the Secretary of Labor. *Id.* Thus, section 60–1.26(a)(2) qualifies the Government's responsibilities under section 209(b) of the Order, rather than vice versa, and the two provisions can be read consistently.

**15.** For example, to the extent that the exhaustion argument is rooted in notions of deference to the administrative process and the administrative agency, the argument has no bearing in the instant context.

reached in the exercise of our equitable discretion, for "the manner, means and method for resolving" this dispute must be devised under "inherent equitable principles." *R. L. Johnson v. Goodyear Tire & Rubber Co.,* 5 Cir., 1974, 491 F.2d 1364, 1367.[16] In light of our holding that NOPSI is covered by the Executive Order and has violated it, our primary mission at this point, of course, is to render such relief as is necessary and appropriate to effectuate the mandate of the Executive Order as fully and expeditiously as possible. However, the relief imposed should not "run against the grain of fundamental fairness which should hopefully be the outcome of any equitable decree." *Id.* at 1379. In the particular setting of this case, where NOPSI has never agreed to be bound by the Order, we believe that fundamental fairness requires that the Government, armed this time with this court's opinion, now obtain the company's voluntary compliance before calling for the support of our injunctive powers.

Other equitable factors support this result. The basic approach of the Executive Order program, as implemented, is enforcement by Executive agencies, in particular the Department of Labor, even though the Order itself provides the judicial enforcement alternative in section 209(a)(2). The Executive has expertise, which this court lacks, in the administration of the program, and that expertise can profitably be brought to bear on the problem at bar. Further, we see no reason to burden our scarce judicial resources with the task of supervising the enforcement of the federal contract compliance program, unless such judicial enforcement becomes necessary.

■ Our decision today is not an invitation to further delay by NOPSI in complying with the Executive Order. Such delay would be intolerable. In its brief, NOPSI states:

> If a court of final appellant (sic) resort upholds the District Court determination that NOPSI is a government contractor notwithstanding its refusal to consent to the contractual equal opportunity provisions of Executive Order 11246, the General Services Administration and OFCC should then be afforded the opportunity to work with NOPSI in developing an appropriate affirmative action program, if indeed one is found necessary . . .

Brief for Appellant at 46–47.[17] That statement underlies the remedial approach which we today require. We assume, based on the quoted passage, NOPSI's good faith in complying with the Order, given our holding that the company is covered by it.

To restate our decision, then, the appropriate government compliance agency— whether OFCC or GSA—may proceed by administrative action to obtain NOPSI's compliance with the Executive Order. Though we are removing the injunctive mandate of the district court, our decision contemplates good faith negotiations between the parties, and certain issues decided herein are precluded from further negotiation. The company cannot any longer dispute its coverage under the Executive Order, nor can the company attempt to nullify the effect of the Order's application by demanding limitation-of-scope language in any contract or proposed affirmative action program that would restrict the impact of the Order. Moreover, NOPSI has no valid fourth amendment objections to the Government's demands for access either to the company's facilities or to the company's

---

16. *Johnson* is one of the cases cited by the Government for the proposition that the district court's retention of jurisdiction and injunctive order were justified. While those cases indicate that the district court had the authority to take the action which it took—a conclusion we do not dispute—they in no way suggest that the district court's injunctive order was required in the circumstances before us.

Since we have concluded that our remedial tack will best effectuate the Executive Order, discussion of those cases is unnecessary.

17. NOPSI's statement suggests the possibility that an affirmative action program might not be found necessary. We read the regulations, however, to require a written affirmative action program. *See* 41 C.F.R. § 60–1.40(a).

books and records, nor can NOPSI further delay or resist compliance by insisting on merely technical or unnecessary procedural niceties.

The Government may proceed at once in enforcing the Executive Order by administrative action. The parties are advised that, having fashioned our relief on the assumption of NOPSI's good faith in complying with our decision herein, this court will look with disfavor on any future attempts to delay compliance.

MODIFIED AND AFFIRMED.

CLARK, Circuit Judge, dissenting:

The decisive question in both this case and *United States v. Mississippi Power & Light Co.*, 553 F.2d 480 (5th Cir. 1977), which we also decide today, is whether the federal government may impose a substantial contract obligation on a public utility simply because that utility supplies energy to federal installations as required by state law and the terms of its state or municipal franchise. The majority answers in the affirmative. I respectfully disagree.

### I.

In order to determine whether New Orleans Public Service, Inc. [NOPSI], or Mississippi Power & Light Co. [MP&L] must comply with a comprehensive equal opportunity clause despite their explicit refusals to subject themselves to it, three issues must be resolved. First, was the issuance of the Executive Order which requires the clause be included in every federal contract a valid exercise of Presidential power? Second, what relation must exist between a person and the federal government before that person is subject to the dictates of the equal

opportunity clause by operation of the Executive Order? And third, does the requisite relation exist between the federal government and either NOPSI or MP&L? Since the resolution of the second and third issues furnishes a sufficient ground for the decision of this case, I do not reach the constitutional puzzles presented by the first.[1]

The relation that must exist between a person and the federal government before that person is bound to comply with the equal opportunity clause by operation of the Executive Order is defined by the text of the Order itself. Like its predecessors, Executive Order No. 11246[2] is not all inclusive. It was promulgated to discourage only certain classes of persons who do business with the federal government from engaging in discriminatory employment practices. The Order directs all federal contracting agencies to include the equal opportunity clause in virtually every "Government contract" consummated after October 24, 1965.[3] The first provision of the clause commands the "contractor" to refrain from discrimination, and to take affirmative action to ensure non-discrimination in recruiting, hiring, promoting, and discharging his employees during the performance of his government contract.[4] Other provisions require that he perform related tasks, such as filing reports describing his employment practices and including the clause in each of his subcontracts. On its face, then, the Executive Order extends the obligation to comply with the terms of the equal opportunity clause only to those who (1) have been awarded a federal government contract, (2) after the effective date of the Order, and (3) have not yet fully performed their contractual commitments.[5]

---

1. For the purposes of this dissent, I make two assumptions. The first is that the Executive Order is valid and possesses the force and effect of law. The second is that the Secretary of Labor did not exceed the rulemaking authority granted him by the Executive Order when he issued 41 C.F.R. § 60–1.4(e) (1976), *as amended*, 42 Fed.Reg. 3454, 3459 (1977), which incorporates the equal opportunity clause into

all non-exempt government contracts by operation of the Executive Order.

2. 3 C.F.R. 169 (1974).

3. *Id.* §§ 202 & 405.

4. *Id.* § 202.

5. While the Executive Order also imposes obligations on other classes of individuals, such as

Although the Executive Order does not explicitly define the term "government contract," there is nothing in its language which suggests that anything less than a contractual relation—as those words are commonly understood in the law—between a person and the federal government was intended to suffice for coverage. The word "contract" is an unambiguous legal term of art connoting an enforceable promise or set of promises between mutually consenting parties. Turning to the "executive history" of the Order or to the Secretary's implementing regulations to vary this unambiguous meaning would be unjustifiable. "[W]here the words are plain there is no room for construction." *Osaka Shoshen Kaisha Line v. United States,* 300 U.S. 98, 101, 57 S.Ct. 356, 357, 81 L.Ed. 532 (1937), *quoted in, Hodgson v. Mauldin,* 344 F.Supp. 302, 307 (N.D.Ala.1972), *aff'd,* 478 F.2d 702 (5th Cir. 1973); *Souder v. Brennan,* 367 F.Supp. 808, 812 (D.D.C.1973). Although these cases involved the interpretation of a statute rather than an executive order, there is no reason why the canons of construction should not be the same.

The regulations promulgated by the Secretary pursuant to his authority to issue such rules as he deems necessary to accomplish the purposes of the Executive Order,[6] however, might be read as taking a broader view of the meaning of the word "contract" as it is used in the Executive Order. 41 C.F.R. § 60–1.3 (1976), *as amended,* 42 Fed. Reg. 3454, 3458 (1977), provides:

"Government Contract" means any agreement or modification thereof between any contracting agency and any person for the furnishing of supplies or services or for the use of real or personal property, including lease arrangements. The term "services," as used in this section includes, but is not limited to the following services:

Utility . . .

persons bidding for a government contract, the scope of those obligations is determined by subsequent sections of the Order itself rather than by the equal opportunity clause.

"Modification" means any alteration in the terms and conditions of a contract, including supplemental agreements, amendments, and extensions.

Since regulations issued pursuant to a valid executive order stand on no better footing than regulations issued pursuant to a statute, it follows that the Secretary's regulations possess the force and effect of law only if they are "(a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable." 1 K. Davis, Administrative Law Treatise § 5.03, p. 299 (1958) & § 29.01–1, p. 654 (Supp.1976). The Executive Order requires the presence of the equal opportunity clause only in contracts. If the term "agreement" used in Section 60–1.3 was intended to be more inclusive it would be void since it would exceed the scope of the Secretary's rulemaking authority. As the Supreme Court recently stated:

The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is 'the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.'

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 213, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668, 688 (1976), *quoting Manhattan General Equipment Co. v. Commissioner of Internal Revenue,* 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528, 531 (1936). The same principle is applicable here.

Moreover, even if the Executive Order could be read to cover parties to unenforceable agreements or non-contracts, the federal government's position would not be measurably advanced. The Executive Order merely requires contracting agencies to include the equal opportunity clause in their bid lettings and contracts. The supplementary regulation, Section 60–1.4(e), provides only that the clause is in the contract whether or not the agency remembered to

6. 3 C.F.R. 169, § 201 (1974).

put it there. Therefore, it is necessary that an enforceable contract exist between a person and the government if there is to be a basis for the enforcement of the clause. If the clause were placed in a void agreement, it would fail with the rest.

NOPSI and MP&L are public utility companies. Although their arrangements with their respective regulatory authorities are not identical in form,[7] the effect is the same. Because they hold franchises granted by a state or a city, are engaged in an enterprise affected with the public interest, and hold themselves out as being willing to serve all members of the public, both NOPSI and MP&L have a duty to provide the types of energy they distribute to anyone within their certificated area who requests it and complies with reasonable conditions of service. *Morehouse Natural Gas Co. v. Louisiana Public Service Commission,* 242 La. 985, 999–1000, 140 So.2d 646, 651 (1962); *Capital Electric Power Association v. Mississippi Power & Light Co.,* 218 So.2d 707, 713 (Miss.1968). In exchange, they receive the right, to some extent exclusively, to supply utility service to customers within their certificated area at a price set by their regulatory authority, and they are guaranteed a reasonable rate of return on their investment.

Since the majority has described the history of NOPSI's interaction with the federal government, only brief recap is necessary here. NOPSI has furnished federal installations with utility service for more than 50 years. In *United States v. New Orleans Public Service, Inc.,* 8 Fair Empl. Prac.Cas. 1089, 8 Empl. Prac. Dec. 9795 (E.D.La.1974), the court found that NOPSI currently supplied 22 federal facilities with electricity, natural gas, or both. In some instances there is a written agreement between NOPSI and the federal government concerning essential terms, such as the applicable rate and volume of service demanded, while in others the understanding is unwritten. Although most of these arrangements pre-date the Executive Order, a few were entered into after it became effective. The price term of every agreement was changed as recently as 1973, when the New Orleans City Council revised NOPSI's rate schedule, and on at least one occasion since the issuance of the Order the government requested and received additional service at one of its locations. Recently, when NASA insisted that its proposed written agreement with NOPSI contain the equal opportunity clause NOPSI refused to capitulate. Instead, NOPSI informed NASA it would continue to supply NASA's energy requirements at the regulated price as both its franchise and Louisiana law require, but expressly refused to subject itself to the equal opportunity clause.[8]

Government contracts do differ from contracts between private parties in some respects, *see* J. Paul, United States Government-Contracts and Subcontracts 69–75 (1964), but no such difference affects the result here. Although contracts of the United States are governed by federal law, *United States v. Seckinger,* 397 U.S. 203, 210, 90 S.Ct. 880, 884, 25 L.Ed.2d 224, 232 (1970), "[i]t is customary, where Congress has not adopted a different standard, to apply to the construction of government contracts the principles of general contract law." *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 410–412, 68 S.Ct. 123, 125–26, 92 L.Ed. 32, 37–38 (1947), *quoted in, Security Life & Accident Insurance Co. v. United States,* 357 F.2d 145, 148 (5th Cir. 1966). One of the most fundamental of those principles is that to be enforceable, a contract

---

**7.** NOPSI supplies electricity and natural gas to residents of New Orleans pursuant to an indeterminate permit issued by the New Orleans City Council in 1922. MP&L operates under a franchise granted to it by the Mississippi Public Service Commission in 1956.

**8.** Since MP&L's interaction with the federal government contains the same essential elements—written and unwritten arrangements

for service consummated before and after the issuance of the Order, changes in the rate applicable to the government since 1965, and an express refusal to be bound by the equal opportunity clause—MP&L stands in the same posture as NOPSI, and I shall not needlessly prolong this dissent by recounting its course of dealing in detail.

must be supported by valid consideration. *Estate of Bogley v. United States,* 514 F.2d 1027, 1033, Ct.Cl. (1976); 1 S. Williston, Contracts § 99, p. 367 (3d ed. 1957); 1A A. Corbin, Contracts § 114, p. 498 (1963). There is no reason why this rule should not apply to contracts with the federal government; at least one court has assumed that it does. *See United States v. Marchetti,* 466 F.2d 1309, 1317 n. 6 (4th Cir.), *cert. denied,* 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972).

A promise to perform a service which one is under a pre-existing legal obligation to perform is not valid consideration for a return promise. *United States v. Bridgeman,* 173 U.S.App.D.C. 150, 523 F.2d 1099, 1110 (1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1744, 48 L.Ed.2d 206 (1976); 1 S. Williston, *supra,* § 132, p. 557; 1A A. Corbin, *supra,* § 171, p. 105. Nor is it merely the return promise that is unenforceable. Because the return promise is unenforceable, there is no mutuality of obligation and therefore no contract is ever formed. Of course, in the event that the party subject to the pre-existing obligation does more than his duty requires, he creates consideration sufficient to support the return promise. 1 S. Williston, *supra,* § 132, pp. 558–59; 1A A. Corbin, *supra,* § 192, p. 180.

The application of these principles to the facts of this case is straightforward. Since both NOPSI and MP&L have a pre-existing legal obligation to supply utility service to the federal installations within their certificated area at the applicable rate irrespective of their agreement to do so, their arrangements with the federal government were instances of performance of their duty to serve customers, not contracts with the federal government. Moreover, an examination of the record reveals that none of the agreements between the utilities and the federal government purported to bind either utility to treat the government any differently from the way state law obliged it to treat other customers of equal size. Therefore, neither utility is a government contractor within the meaning of the Executive Order, and neither has an enforceable obligation to comply with the equal opportunity clause.

The majority takes the position that by accepting their franchises, NOPSI and MP&L assumed an obligation to furnish the federal government with energy on whatever terms it might wish to impose, including a requirement that they comply with the provisions of the equal opportunity clause. But there is nothing in the record which supports the notion that either the utilities or their respective regulatory authorities were aware that NOPSI and MP&L were undertaking such an obligation at the time the franchise agreements were executed. And since the franchises were agreements with a state or city rather than the federal government, no such obligation can be implied as a matter of law under Section 60–1.4(e) of the regulations. In addition, both utilities accepted their franchises long before Executive Order 11246 was issued. To impose the burden of complying with the equal opportunity clause on them because of actions pre-dating the Order would be inconsistent with Sections 202 & 405 which indicate that the order is triggered only by actions taken after October 24, 1965.

The majority also suggests that because NOPSI and MP&L are public utilities it is justifiable to saddle them with the record-keeping, expense, and other burdens that compliance with the equal opportunity clause entails. It contends that to permit them to use their position as the sole sources of energy within their certificated areas to force the federal government to choose between bargaining over the inclusion of the clause and doing without energy, would be inconsistent with the Supremacy Clause.[9] The premise of this argument is that the utilities' economic leverage is the result of state action, because purely private action cannot violate the Supremacy Clause. This premise is not supported by the record.

---

**9.** U.S.Const., Art. VI, cl. 2.

As the Supreme Court recognized in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351 n. 8, 95 S.Ct. 449, 454, 42 L.Ed.2d 477, 484 (1974), where it held that a public utility's termination of service to a customer did not constitute state action for Fourteenth Amendment purposes, "public utility companies are natural monopolies created by the economic forces of high threshold capital requirements and virtually unlimited economy of scale." *See* 2 A. Kahn, The Economics of Regulation: Principles and Institutions 119–126 (1971). It is therefore unlikely that NOPSI or MP&L faced any greater competition at the time they accepted their franchises than they do today, and there is nothing in the record to show that they did. If they did not, then by granting them franchises their respective regulatory authorities did little more than acknowledge their pre-existing positions as the sole suppliers of energy within their certificated areas. It appears that the laws of economics rather than those of a state made it possible for NOPSI and MP&L to amass the leverage they possess.

The facts of this case present no conflict between the franchises and the Executive Order. The franchises were created to ensure that a dependable supply of energy would be available to inhabitants of New Orleans and Mississippi at a regulated price. Here, the federal government has availed itself of the benefits of this policy by requiring the utilities to supply it with service under and in accordance with the terms of their franchises, just as any other inhabitant might do. The validity of the franchises and the purposes they are intended to serve have not been challenged but rather affirmed. This is not a case in which a regulatory authority or a franchise holder has invoked a franchise to bar the United States from generating its own energy or from contracting with someone other than the franchise holder as a source of supply. Nor has the United States shown that it is impossible for energy to be otherwise obtained. At most the government suggests that the franchise holders operating under the terms of their franchises are the cheapest sources of energy within their certificated areas. Even the government cannot have the best of all worlds: low-priced energy and a contract vehicle for making the equal opportunity clause enforceable.

## II.

Had the court adopted the position of this dissent, the effectiveness of the Executive Order as a tool for eliminating discrimination in employment would not have been destroyed. The vast majority of those supplying goods and services to the federal government are not under a pre-existing legal obligation to do so but rather are contractors within the meaning of the Order. Nothing said here would affect the applicability of the provisions of the equal opportunity clause to them. Nor would such a decision leave public utilities at liberty to treat their employees as they pleased. They are subject to a plethora of state and federal measures designed to eliminate discriminatory employment practices.

I do not dissent to defend discriminatory employment practices. But when the government has chosen to attack them through the mechanism of inserting a non-discrimination clause in its contracts rather than by enacting a statute, there are limits to what it can accomplish. Those limits have been exceeded here. The majority makes a mistake when it allows the government to forge ahead to a desirable end by means that stand the law of contracts on its head.